[No. A038989. First Dist., Div. One. Feb. 23, 1990.]

In re the Marriage of LYNDA and SAUL ZAENTZ.
LYNDA ZAENTZ, Appellant, v.
SAUL ZAENTZ, Appellant.

[Opinion certified for partial publication.*]

---

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of wife's cross-appeal.

COUNSEL

Stotter, Chamberlin & Coats, Lawrence H. Stotter, Blanche C. Bersch, DeGoff & Sherman and Richard Sherman for Appellant Wife.

Burnstein, Walker & Bull, Burnstein & Walker, Malcolm Burnstein, Catherine Trimbur and Robert L. Walker for Appellant Husband.

OPINION

RACANELLI, P. J.—This case concerns a community property dispute between Saul Zaentz (husband) and Lynda Zaentz (wife) over the financial rewards of husband's role as producer of the Academy Award-winning movie "Amadeus." The central issue relates to the trial court's allocation of an additional $600,000 to the community as compensation for husband's production and financial contributions to "Amadeus."

### PROCEDURAL HISTORY

On November 16, 1983, wife filed a petition for dissolution of the marriage. Thereafter, following his response, husband filed a motion to set the alternative valuation date as of the date of separation.[1]

In April 1985, wife's motion to join the Saul Zaentz Company (SZC) was granted. But immediately before trial, the court granted SZC's motion for summary judgment that SZC owned the *contractual* rights to the movie. The lengthy trial, which began on June 11, 1985, concluded with the submission of written arguments.

In January 1986, the trial court granted wife's motion to reopen to take additional evidence concerning posttrial profits from the movie "Amadeus." In the final judgment entered in April 1987, wife was awarded, inter alia, spousal support of $5,000 a month for 1986 through 1988, and[2] approximately $200,000 as her share of other community property plus half of the disputed $600,000. (The bulk of the remaining assets belonged to husband as his separate property or to SZC.) Wife was also awarded approximately $250,000 of her claimed $400,000 in attorney's fees as well as other fees.

---

[1] The trial court never definitively ruled on this motion, but the assets were ultimately valued as of the time of trial or later.

[2] Extended through the appeal process.

Husband now appeals from that part of the judgment awarding wife the additional $300,000 as her share of the community property remuneration for husband's producing and financing efforts. Wife cross-appeals from specific parts of the judgment.

## FACTS

We recite the relevant factual background in a manner facilitating analysis and discussion.

### The Marriage

Husband and wife married on October 15, 1978, and separated on November 8, 1983. Wife, 44 years old at the time of trial, had previously been employed as a secretary and administrative assistant and also had briefly operated a small business venture in the mid-1970's. In 1983, wife worked for several months as a production assistant during the filming of "Amadeus" in Czechoslovakia. Husband, 64 years old at the time of trial, had spent his adult life in the entertainment industry, primarily music (records) and film. In 1975, he coproduced (with Michael Douglas) the Academy Award-winning film, "One Flew Over the Cuckoo's Nest."

In 1977, husband founded SZC for the purpose of producing movies.[3] He initially owned 40 percent of the common stock in SZC, but then assigned part of his interest to a number of beneficial trusts, in many of which he was a named beneficiary. During the marriage, husband owned only 5.5 percent of the common stock. Husband acted as chief executive officer of SZC and was also chairman of the board of directors.

In 1979-1980, SZC built a large $6 million building in Berkeley containing film editing and postproduction facilities for motion pictures. The facilities were leased out or used for SZC's own projects.

Prior to the marriage, SZC had lost a great deal of money on its film projects and consequently was in a poor financial condition during the early part of the marriage. In 1981, Milos Forman, the acclaimed director of "One Flew Over the Cuckoo's Nest," approached husband about a possible joint venture to make a motion picture from the award-winning stage play "Amadeus." Ultimately, a written agreement was entered into in 1982 by husband, Forman and Peter Shaffer, the playwright. Among other responsi-

---

[3] Husband is also an officer in Fantasy, Inc. (formerly Fantasy/Galaxy Record Company), from which some of his salary derives.

bilities, husband was to serve as the producer for a fee of $300,000 plus per diem expenses.[4]

At the time the parties separated, the filming had been completed and postproduction work was in progress. The movie was eventually released in 1984 and achieved tremendous critical acclaim and financial success. Since the producer's or producing entity's share of the profits contractually inured to SZC, husband asserted that wife had no right to any part of that money. As earlier mentioned, the trial court had determined that the contractual rights to the film belonged to SZC.

Wife presented financial expert testimony that husband's net worth increased by more than $2 million over the course of the marriage, a calculation strenuously disputed by husband.

### "Amadeus"

Apparently, Forman and Shaffer had previously approached several movie studios but were unsuccessful in obtaining necessary financial commitments and assurance of artistic freedom.[5] After extended negotiations, an agreement was signed in January 1982, providing Shaffer with a fee of $500,000 for writing the screenplay, Forman with a fee of $500,000 for directing the movie, and husband with a fee of $300,000 for producing the movie. Each of the principals or their individual assignees were to share the profits equally. The agreement also provided that the SZC building would be used as collateral to secure a minimum loan of $10 million to finance the project, but with the added proviso that husband "personally and on behalf of his heirs at law" would guarantee the financing.

The movie was filmed in Czechoslovakia and Italy between January and July 1983. The postproduction and editing stages occurred during the year August 1983 - August 1984. The prizewinning movie was released in September 1984.

The original budget estimate ranged from $8 to $10 million; the final overbudget cost was approximately $16.5 million. The film was financed from a variety of sources: SZC's cash resources, a $6 million loan from the Canadian Commercial Bank (secured by the SZC building, husband's per-

---

[4] Husband's $300,000 compensation was deferred without interest, interest accruing to SZC. Because the fee was to be paid in installments, the trial court awarded the community some $213,000 for the amount earned during the term of the marriage. Husband also received his regular salary of $107,000 per year (half from SZC and half from Fantasy).

[5] The Hollywood film industry is seemingly hesitant to make what is known as "costume" dramas.

sonal guaranty and the corporate guaranties of Fantasy and Obelix); and other loans from company officials and employees and related companies.

At the time of trial, the film had gross receipts of nearly $50 million. Based on this figure, wife's financial experts estimated a total profit of between $8 to $14 million. Paul Zaentz (husband's nephew who performed legal and tax work for SZC) originally testified that by May 1985 only $600,000 in profit had accrued to SZC. After the case was reopened for the submission of profit data as of December 1985, he then estimated that SZC would realize a profit of nearly $2.6 million from its share of "Amadeus" plus some $2.5 million in interest on funds advanced for production, and deferred facilities rental fees of $700,000.

### The Project Financing

It is no hyperbole to describe the relevant financial history as a circuitous journey through a labyrinth of interlocking and interrelated corporate entities, family trusts and closely owned holding companies. We begin the journey, as the court did below, at its probative point of departure.

Over husband's continuing objections, the trial court received testimony on the financing arrangements for "One Flew Over the Cuckoo's Nest" as a relevant background to the financing of "Amadeus" and husband's use of an interlocking network of corporate entities.

The evidence revealed that the rights to the Kesey book were originally held by the Bryna Company (owned by Kirk Douglas) and sold to Skylark, a Netherland Antilles corporation consisting of several trusts for the benefit of Bernard and Sam Zaentz (husband's brothers) and Bernard Lieberman (husband's long-time friend and business associate). Husband had personally guaranteed payment to Bryna of any future profits due from Skylark. Skylark had assigned its rights to the film to Zwaluw, its Netherlands Antilles subsidiary. The film was funded by another entity called Argosy Venture, a set of foreign trusts, whose beneficiaries included husband's children from a previous marriage. However, the Argosy Venture funds actually came from Zwaluw, which ultimately possessed ownership rights. "Cuckoo's Nest" eventually grossed about $90 million, and Zwaluw ultimately loaned between $25 to $30 million to SZC and Fantasy, Inc.

In 1977, SZC was formed with an initial capitalization of $100,000. Husband originally owned 40 percent of the stock[6] and later transferred (for

---

[6]Other shareholders included husband's associates and members of a Chicago tax firm headed by Burt Kanter, a recognized architect of entertainment industry tax shelters, pri-

a nominal consideration) 34.5 percent to several trusts in which he was a designated beneficiary.

Zwaluw loaned SZC several million dollars to produce two films which proved unsuccessful. SZC had also borrowed $6 million to build the Berkeley production facility. This money apparently came from Obelix, a subsidiary of Zwaluw. By 1981, SZC owed Zwaluw $16 million; this debt, plus title ownership of the building, was transferred back to SZC in exchange for all the newly created preferred shares of stock in SZC.

Zwaluw was also involved at another level of this intricate financial construct: it made loans to the mortgage company (controlled by the Holding Company owned by Burt Kanter), which in turn lent money to husband and his associates at less than prime rate interest. Zwaluw, through the mortgage company, also provided funds for "Amadeus."

SZC itself established so-called "251 accounts" whose purpose was to channel funds as needed to husband and other SZC/Fantasy employees and associates. The discernible history of repayment seemed sporadic at best. There was other evidence of the existence of interlocking investment entities in which husband was involved.

### Movie Financing

Substantial testimony was presented concerning the intricate details of movie financing rivaling that presented by the accountants. Each side presented a film industry expert, who testified to the general practices in the industry and then gave their respective opinions on the "Amadeus" deal. (P)Wife's expert, Joseph Peckerman, testified that major producers (such as husband) typically received a fee *and* a percentage of the profits or receipts, with the agreed percentages variously calculated on the basis of gross or net receipts, and/or pre- or postdebt computations and the like. Peckerman opined that such producers generally receive 10 percent to 20 percent of the final profit and generally described the method by which production and financing entities charge fees to a project by inflated pass-through assessments. In his opinion, husband's specified compensation under the "Amadeus" agreement was well below industry standards in the absence of a personal percentage of the profits; he noted, however, that an elaborate interlocking arrangement of offshore trusts could be used to hide profits in order to avoid taxes. Peckerman believed that husband should have been

---

marily offshore trusts. It was Kanter who set up Zwaluw. There was also testimony that the 1976 Tax Reform Act greatly restricted use of such shelters.

more handsomely compensated in view of his responsibility for both financing and production. Finally, he noted that mere ownership rights in a project (held by SZC) did not determine entitlement to the income stream.

Husband's expert, Norman Rudman, disputed wife's evidence that husband should have received greater compensation; he stated that smaller independent companies generally did not pay producers fees *and* percentages, and that most smaller companies actually retain the producer's fee and pay a regular salary to their employee/producer.

## DISCUSSION

### *Husband's Appeal*

### I.

Husband's principal argument challenges the trial court's determination of the community's entitlement to an additional $600,000 for his efforts on "Amadeus" as an improper allocation of his separate property to the community.

In its statement of decision, the trial court set forth its findings and supporting evidence in an abundance of detail. In essence, the court found (after hearing considerable testimony from film industry experts called by both parties, officers of SZC and interrelated companies assessing the value of husband's services to SZC and the results achieved) that the community was entitled to be remunerated for husband's production duties and financing contribution in the amount of $600,000 over and above the $300,000 and per diem paid to husband. In awarding wife an equal share of the community interest ($300,000), the court underscored the evidence of husband's unique value to SZC in producing "Amadeus" and the scope of the community's and husband's investment in "Amadeus," including his $6 million personal guaranty pledge of community and separate assets and separate property encumbrance, as well as the increase in value of husband's stock in SZC.

It is apparent that in the absence of specified dollar amounts, the trial court's precise calculation formula cannot be determined. However, under the established principles of substantial evidence which govern our review, the record as a whole reflects more than ample evidence upon which the court could reasonably base the factual determination it reached.

■ Accordingly, we are bound to uphold that decision where, as here, it is adequately supported by such substantial evidence. In doing so, we view

the evidence in a light favorable to respondent, according the benefit of every reasonable inference and resolving all conflicts in favor of the judgment below. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 [122 Cal.Rptr. 79, 536 P.2d 479].) It is axiomatic that "[f]indings of a trial court as to the separate or community character of assets are binding on the appellate court if supported by substantial evidence. [Citations.]" (*In re Marriage of Trantafello* (1979) 94 Cal.App.3d 533, 546 [156 Cal.Rptr. 556]; accord *Beam* v. *Bank of America* (1971) 6 Cal.3d 12, 25 [98 Cal.Rptr. 137, 490 P.2d 257].) And all issues of credibility are within the province of the trier of fact alone. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].)

Husband argues strenuously that his only remuneration was the agreed sum of $300,000 and that the trial court could not, in effect, rewrite that agreement or order SZC to share some of the profits with him in order to pay wife the additional $300,000.[7] The court may not, he argues, allocate his separate property (stock interest) (see *Machado* v. *Machado* (1962) 58 Cal.2d 501 [25 Cal.Rptr. 87, 375 P.2d 55]); thus, he reasons, the adequacy of his compensation is relevant only if his separate property *increased* in value as a result of his efforts, a factual question the trial court failed to resolve.

In reply, wife advances no less than three theories in support of the trial court's determination: (1) that the marital relationship imposes a partnership duty on a spouse not to give away community property or to enhance separate property interests without the other's consent; (2) that under our holding in *In re Marriage of Beltran* (1986) 183 Cal.App.3d 292 [227 Cal.Rptr. 924], reimbursement is required if community property is lost as a result of the conduct of a spouse; and (3) settled law establishing the trial court's broad discretion to achieve equity (see, e.g., *In re Marriage of Connolly* (1979) 23 Cal.3d 590 [153 Cal.Rptr. 423, 591 P.2d 911] and *In re Marriage of Hug* (1984) 154 Cal.App.3d 780 [201 Cal.Rptr. 676, 46 A.L.R.4th 623]). We think the first two theories are inapt and the third over-generalized in the circumstances presented.

■ Clearly, no legal partnership duties are imposed on spouses, and wife's reliance on *In re Marriage of Brigden* (1978) 80 Cal.App.3d 380 [145 Cal.Rptr. 716], is simply misplaced.[8] Marital partners are only held to a

---

[7] Husband steadfastly maintains that any increase in the value of his SZC stock should remain his separate property because his contractual agreement with Forman and Shaffer was the result of arms-length bargaining.

[8] *Brigden,* by way of dictum, equated the marital community as a partnership insofar as the spouses possessed " 'present, existing and equal' interests" in community property. (*Id.*, at p. 389.)

duty of good faith. (See Civ. Code, § 5125, subd. (e); *In re Marriage of Stevenot* (1984) 154 Cal.App.3d 1051, 1068 [202 Cal.Rptr. 116].)

Similarly, wife's interpretation of our holding in *Beltran* is overstated. We there held under the special facts presented that "as a matter of equity [husband's] criminal conduct . . . which directly caused forfeiture of pension benefits justified the trial court's conclusion that wife was entitled to reimbursement for her share of such lost community property." (*In re Marriage of Beltran, supra*, 183 Cal.App.3d at p. 295.) No comparable misconduct was even alleged herein.

With reference to wife's third theory, certainly the trial court has broad discretion to achieve equity in the distribution of marital assets. Indeed, the trial court's award herein may be properly affirmed on the basis of a reasonable exercise of that discretion.[9]

■ Although husband vigorously attacks the ruling reopening trial proceedings to consider evidence of profits as of December 31, 1985—since the value of the movie was zero when the parties separated, any earnings of the company, he contends, should not be arbitrarily applied to increase its overall value—we conclude the trial court acted within its discretion in reopening the evidence to consider profits generated through 1985. Whether or not the movie was completed and receiving income at the time of separation, the time and artistic energies expended occurred in some appreciable degree during the marriage. Husband devoted the better part of two years during the marriage working only on the production of "Amadeus." Thus, the community would be entitled to at least an equitable portion of the income generated as a result thereof. (See *In re Marriage of Worth* (1987) 195 Cal.App.3d 768, 773 [241 Cal.Rptr. 135]; *Waters v. Waters* (1946) 75 Cal.App.2d 265, 270 [170 P.2d 494]; *In re Marriage of Johnson* (1983) 143 Cal.App.3d 57, 61 [191 Cal.Rptr. 545].) The evidence showed that all of the filming and nearly one-third of the editing, and execution of some of the distribution agreements, were completed by November 1983. Accordingly, the amount of profits aggregating through 1985 was an appropriate circumstance for the trial court to consider in arriving at its factual determination.

Moreover, husband's argument conveniently overlooks the principles of substantial evidence which govern on appeal. Whether husband is unpersuaded by the testimony of wife's experts (in favor of that of his own

---

[9] The cases relied upon by wife are not immediately helpful since they dealt with in-kind or other divisions of assets (*In re Marriage of Connolly, supra*, 23 Cal.3d 590; *In re Marriage of Hug, supra*, 154 Cal.App.3d 780); appropriate rate of interest (*In re Marriage of Escamilla* (1982) 127 Cal.App.3d 963 [179 Cal.Rptr. 842]); or tax consequences of property division (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738 [131 Cal.Rptr. 873, 552 P.2d 1169]).

experts) is of no consequence. The trial court was within its discretion to rely on that testimony notwithstanding the existence of conflicting evidence.

■ The trial court stated in lucid terms that its finding of a community interest was based on a consideration of the testimony by film experts, the parties' analyses of the results achieved and of the value of the services rendered by husband on behalf of SZC in the production of "Amadeus," including his unique value to that company, as well as the nature and extent of husband's (or the community's) investment in the film. This last factor, the court declared, arose from husband's personal guaranty of the $6 million loans, his pledge of community and separate assets and encumbrance of his separate property for the project, and the increase in value of SZC stock and husband's proportionate interest therein.

The totality of the evidence highlighted husband's vital importance to the business expectations of SZC. The joint venture agreement stipulated he could use any production company, including one newly established, at his election. Husband was the linchpin of the company's operations and had primary responsibility for successful production of the film. At the same time, as wife's expert described, husband personally shouldered two major risks: his personal guaranty of the $6 million bank loan, and his personal written commitment to raise the necessary funds or indemnify the other venturers. Quite obviously, the community assets were thereby placed at risk, strongly indicating that a fair apportionment of the economic rewards was justly allocable to the community.

Wife's expert witness further testified that husband additionally functioned as an unpaid "completion bonder" for the film (an entity that would have been paid some $500,000 and other related fees to guarantee necessary financing if the film went overbudget, which it did). Of cardinal significance, the record demonstrates that husband performed a variety of important services for which he would have been entitled to reasonable compensation had the benefits not inured directly to SZC.

Finally, it warrants repetition that in addition to the one-third total profits received by SZC, it also earned an estimated $2.5 million in interest, together with an interest component on husband's deferred producer's fee (some $213,000 for at least two years).

■ Husband acknowledges the doctrine of equitable apportionment in connection with the increased value of his separate property stock interest. Under that doctrine, "since income arising from the husband's skill, efforts and industry is community property, the community should receive a fair share of the profits which derive from the husband's devotion of more than

minimal time and effort to the handling of his separate property." (*Beam* v. *Bank of America, supra*, 6 Cal.3d at p. 17.) However, he questions wife's expert testimony positing an increase in the value of husband's stock at $319,656, in view of its initial negative value, fortified by his own expert's opinion that in 1983 the stock remained worthless because the movie had yet to be released or produce a profit. While disregarding the correlation of community rendered services to subsequent profit accruals, husband offers new calculations which include the profit figures admitted in evidence in January 1986. According to these revised figures, wife's exhibit (33) would reflect an increase in the value of husband's stock of $195,701, while husband's own exhibit (JJ) would show an increase of $96,607.

Two models are generally used in apportioning increased value in separate property: "One method of apportionment, first applied in *Pereira* v. *Pereira* (1909) 156 Cal. 1, 7 [103 P. 488] and commonly referred to as the *Pereira* approach, 'is to allocate a fair return on the [husband's separate property] investment [as separate income] and to allocate any excess to the community property as arising from the husband's efforts.' (*Estate of Neilson* (1962) 57 Cal.2d 733, 740 [22 Cal.Rptr. 1, 371 P.2d 745].) The alternative apportionment approach, which traces its derivation to *Van Camp* v. *Van Camp* (1921) 53 Cal.App. 17, 27-28 [199 P. 885], is 'to determine the reasonable value of the husband's services . . . , allocate that amount as community property, and treat the balance as separate property attributable to the normal earnings of the [separate estate].' (*Tassi* v. *Tassi* (1958) 160 Cal.App.2d 680, 690 [325 P.2d 872].)" (*Beam* v. *Bank of America, supra*, 6 Cal.3d at p. 18.) Husband urges that the *Van Camp* approach should be applied. However, as wife points out, the trial court made no finding on apportionment and obviously considered the increase in value of husband's stock (or SZC itself) as only *one* factor contributing to the actual financial picture.[10]

■■■ From the evidence before it, the trial court could reasonably have believed that without husband's personal efforts in acquiring the film rights, acting as its producer and managing the financial arrangements, there would have been no economic increase in the value of the company.[11]

Given the extensive though conflicting evidentiary record, and the deference properly accorded to the fact finder, we conclude that the order of

[10] The court also had before it information suggesting husband's net worth increased over $2 million during the course of the marriage.

[11] There was some evidence that husband, through the several trusts, was actually the beneficial owner of 34.5 percent of the stock.

reimbursement to the community of the additional $600,000 for husband's efforts in financing and producing "Amadeus" is adequately supported by substantial evidence and must be upheld.

## II.

Husband's companion attack on the statement of decision, based on the argument that it fails to reveal the legal and factual predicate for the trial court's decision to allocate separate property to the community, is equally unconvincing.

The challenge is directed to a single paragraph (No. 20) of the detailed 20-page document. Husband insists, relying on *In re Marriage of Bergman* (1985) 168 Cal.App.3d 742 [214 Cal.Rptr. 661], that the exact amounts of money and the arithmetical calculations must be provided in the statement of decision. ▮ While we would agree with the *Bergman* court that "better practice" would dictate that trial courts specify the calculations underlying the valuation of assets (*id.*, at p. 754), we likewise agree that the "failure to do so does not constitute reversible error." (*Ibid.*)

We think the trial court diligently and conscientiously sorted through and evaluated a welter of complex and conflicting evidence in arriving at a patently just and equitable determination. The error, if any, in failing to chart the calculus underpinning its ultimate factual determination was clearly harmless.

*Wife's Cross-appeal**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

Judgment affirmed. Each side shall bear its own costs on appeal.

Newsom, J., and Stein, J., concurred.

* See footnote, *ante*, page 154.