Filed 11/26/13  Marriage of Dong and Garbe CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re Marriage of DIANA QIAO DONG and OLIVIER GARBE. | H036286 (Santa Clara County Super. Ct. No. 6-08-FL000101) |
| DIANA QIAO DONG, Appellant, v. OLIVIER GARBE, Appellant. | |

Appellant and cross-respondent Diana Qiao Dong is the petitioner in an action for the dissolution of her marriage to respondent and cross-appellant Olivier Garbe.  The petition was filed in February 2008 and the judgment of dissolution was filed in September 2010.

On appeal, Dong raises multiple claims, as follows:  (1) the trial court erred in ordering termination of spousal support after two years even though the marriage had lasted more than 10 years; (2) Dong was improperly double-charged a total of $35,000 for monies taken from her children's account and accounts awarded to Garbe; (3) the trial court erred by not allowing her to call an expert certified public accountant to testify at trial regarding the valuation of a limited partnership and other financial issues; (4) the trial court erred in designating certain property, such as a financial account and a vehicle,

as community property; and (5) the trial court erred in determining that a $100,000 gift from Garbe's mother upon marriage was Garbe's separate property.

Garbe cross-appeals, challenging the trial court's finding that an apartment in Shanghai, China, was Dong's separate property.

We find no error by the trial court and shall affirm the judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Dong and Garbe first met in 1996, and approximately one year later, Garbe recruited her to work at his company, Winnov LP, as a salesperson. Dong agreed and worked at Winnov LP until her termination from employment in 2008.

Dong and Garbe were married in November 1997 and separated in January 2008. During their marriage, they had two children who were born in 1998 and 2001, respectively.

Dong filed her petition for dissolution of marriage in February 2008. Trial on the support and attorney fee issues was held on various dates between July and November 2008, and a statement of decision addressing those matters was filed in January 2009.

Trial on the dissolution petition commenced in April 2010, culminating in a statement of decision (August 2010) and final judgment (September 2010). The parties timely appealed.

## II.    DISCUSSION

### A.    *Termination of spousal support*

#### 1.    *Standard of review*

Dong suggests that, though the appropriate standard of review of an order terminating spousal support is abuse of discretion, we should instead engage in a de novo

---

[1] We briefly recount the background facts in this section. The facts pertinent to the parties' claims are set forth in greater detail in connection with our discussion of those particular claims below.

review in this case, because the trial court used the "wrong legal standard" in making its order. We disagree.

The proper standard of review is abuse of discretion. "In awarding spousal support, the court must consider the mandatory guidelines of [Family Code][2] section 4320. Once the court does so, the ultimate decision as to amount and duration of spousal support rests within its broad discretion and will not be reversed on appeal absent an abuse of that discretion." (*In re Marriage of Kerr* (1999) 77 Cal.App.4th 87, 93, fn. omitted.) Dong's disagreement is with the trial court's evaluation of the evidence, not the legal standard it applied to that evidence.

> 2. *The trial court did not abuse its discretion in terminating spousal support*

"A trial court should not terminate jurisdiction to extend a future support order after a lengthy marriage, unless the record clearly indicates that the supported spouse will be able to adequately meet his or her financial needs at the time selected for termination of jurisdiction. In making its decision concerning the retention of jurisdiction, the court must rely only on the evidence in the record and the reasonable inferences to be drawn therefrom." (*In re Marriage of Morrison* (1978) 20 Cal.3d 437, 453.) "In ordering spousal support, the trial court *must* consider and weigh all of the circumstances enumerated in the statute,[3] to the extent they are relevant to the case before it." (*In re*

---

[2] Further unspecified statutory references are to the Family Code.

[3] The applicable statute is section 4320, which provides as follows:
"In ordering spousal support under this part, the court shall consider all of the following circumstances:
"(a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account all of the following:
"(1) The marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment.
(continued)

*Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 302.)  "[T]he trial judge must both recognize and *apply* each applicable statutory factor in setting spousal support. [Citations.]  Failure to do so is reversible error."  (*Id.* at p. 304.)

In the statement of decision, the trial court made the following findings regarding spousal support:  "Each party has marketable skills, there is a market for those skills, and there is no time or expense required by either party to acquire appropriate education to develop those skills.  Neither party's present or future earning capacity was impaired by

"(2) The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties.

"(b) The extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party.

"(c) The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living.

"(d) The needs of each party based on the standard of living established during the marriage.

"(e) The obligations and assets, including the separate property, of each party.

"(f) The duration of the marriage.

"(g) The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party.

"(h) The age and health of the parties.

"(i) Documented evidence of any history of domestic violence, as defined in Section 6211, between the parties, including, but not limited to, consideration of emotional distress resulting from domestic violence perpetrated against the supported party by the supporting party, and consideration of any history of violence against the supporting party by the supported party.

"(j) The immediate and specific tax consequences to each party.

"(k) The balance of the hardships to each party.

"(*l*) The goal that the supported party shall be self-supporting within a reasonable period of time.  Except in the case of a marriage of long duration as described in Section 4336, a 'reasonable period of time' for purposes of this section generally shall be one-half the length of the marriage.  However, nothing in this section is intended to limit the court's discretion to order support for a greater or lesser length of time, based on any of the other factors listed in this section, Section 4336, and the circumstances of the parties. [¶] . . . [¶]

"(n) Any other factors the court determines are just and equitable."

4

periods of employment incurred to permit the other party to devote time to domestic duties; neither party contributed to the attainment of an education, training or career or license of the other party; each party has an extremely limited ability to pay spousal support taking into account their earning capacity and debts, after considering the transfers by child support and related expenses incurred. The presumption is that as the primary custodial parent [Garbe] devotes much [*sic*] portion of his income to supporting the children. The marital standard of living is middle class and each party can meet their own needs. Each party has substantial separate property. The marriage is of long duration but not exceptionally long. Each party can engage in gainful employment without unduly interfering with the interest of the children. [Garbe] is 59 years old and [Dong] is 52 years old. Both parties are in good health. There is no evidence of domestic violence in this case. The assertion of domestic violence by [Dong] is not credible and is barred by res judicata, anyway. The court concludes the parties have the ability to meet their future needs. After considering the immediate and specific consequences and balances of hardships, and the goal a supported party be self supporting within a reasonable amount of time, the court awards no spousal support to either party but reserves jurisdiction for both parties until January 25, 2013. After January 25, 2013 the court shall have no jurisdiction to award either party spousal support for any reason at any time. It is the court's intention that January 25, 2013 be an absolute termination date under any circumstances, and is not to be extended."

The evidence presented at the trial supported the trial court's findings on each of the relevant statutory factors. At the time of the trial, Dong was 52 years old, in good health and was aware of no medical conditions which would affect her ability to work. She was born and educated in Shanghai, China, and received a degree in electrical engineering from Shanghai University in 1982. Dong moved to the United States in 1986

5

and earned a masters degree in electrical[4] engineering from San Jose State University in 1991. She became a United States citizen in 1998.

Dong worked for Garbe's company during the marriage and, at one point, had the title of vice president and was placed in charge of a subsidiary company known as Winnov China. Following her termination from Winnov LP, she obtained employment with a different company as a vice president of business development and sales, with an annual salary of $135,000.

In this case, the court's determination that Dong could become self-supporting in 2013 was not based on speculation, but was supported by evidence that she was capable of earning a substantial income. That evidence supports the court's weighing of the section 4320 factors that informed the support decision. The trial court could have reasonably concluded that in view of all of the circumstances presented, Dong "could become, and should become, sufficiently self-supporting within the dates the court set for the reduction and termination of spousal support." (*In re Marriage of Shaughnessy* (2006) 139 Cal.App.4th 1225, 1247.)

Dong relies on *In re Marriage of McTiernan & Dubrow* (2005) 133 Cal.App.4th 1090, but that case turns on its particular facts. In that case, which involved a marriage of eight years, eight months, the trial court imposed a two-year limitation on spousal support, despite evidence showing a great disparity in projected present income between the parties as well as a great disparity in the parties' abilities to maintain their former lifestyle. (*Id.* at p. 1107.) In the present case, there was no evidence of any notable, let alone great, disparity in either Dong's projected present income or her ability to maintain her former lifestyle.

---

[4] Dong said her degrees were in "electronic" engineering, but also did not correct her attorney when he subsequently asked her questions about her "electrical" engineering degrees.

6

In light of the circumstances presented here, the order is consistent with the legislative goal "that the supported party shall be self-supporting within a reasonable period of time." (§ 4320, subd. (*l*).) Dong has failed to show any abuse of the court's broad discretion.

B.    *Division of community property*

1.    *Standard of review*

In her opening brief, Dong acknowledges that, in dissolution proceedings, an order dividing property should be upheld if the order is within the court's discretion and there is substantial evidence to support it, though she cites no authority for this proposition. She then urges us, again without citation to supporting authority, to review this particular order de novo, because "not only is there not substantial evidence to support the decision, but the only documents directly contradict the order."

It is well-settled that "we review the trial court's judgment dividing marital property for an abuse of discretion[, and] . . . we review the trial court's factual findings regarding the character and value of the parties' property under the substantial evidence standard." (*In re Marriage of Sivyer-Foley & Foley* (2010) 189 Cal.App.4th 521, 526.) There is no occasion for us to conduct a de novo review of Dong's fact-based claims that she was improperly charged twice for certain amounts in the division of property.

2.    *The trial court did not err in directing Dong to reimburse the community for monies withdrawn from community accounts*

a.    *$15,000 withdrawn from the Washington Mutual account*

Dong complains that she was improperly charged twice for withdrawals she made from a community bank account after the January 25, 2008 date of separation. The two withdrawals Dong complains of were made on February 1, 2008 ($10,000) and February 19, 2008 ($5,000) from a Washington Mutual joint account (account No. 4077-7). Because Dong was awarded that joint account, valued as of the date of separation, in the

7

judgment of dissolution, she contends she should not have been charged for any postseparation withdrawals from that account.

At trial, Rebecca Alger, Garbe's expert certified public accountant (CPA), calculated the amount of reimbursement Dong owed the community after examining the parties' various accounts. She prepared charts identifying "those transactions . . . that were reflective of monies that had either been clearly taken from community accounts or monies . . . that were deposited into one of the accounts that were in Ms. Dong's name shortly after date of separation or within a few months of separation for which there was no clear indication as to source." The $15,000 in transfers from account No. 4077-7 comprise part of what "Dong would owe back to the community for funds that had been either removed clearly from the community or had mysteriously appeared without explanation."

In its statement of decision, the trial court ordered Dong "to reimburse the community $55,375.61 in missing funds[,] . . . composed of the $35,375.61[5] removed from joint accounts plus the sudden $20,000 withdrawal prior to separation, the location of which was never answered by [Dong] at time of trial. These sums have not been double counted, per Ms. Alger's testimony and are not duplicative of the bank accounts above."

Dong points us to no testimony or evidence to demonstrate that these withdrawals could be traced to her separate property. Instead, the evidence shows she withdrew $15,000 in community property from account No. 4077-7. The mere fact she was later awarded that particular account, valued as of the date of separation, does not retroactively justify her postseparation withdrawals of community funds from it.

---

[5] Of this total, Dong only claims she was double-charged for $15,000, apparently conceding she must reimburse the remaining $20,375.61 she withdrew from joint accounts.

8

b.      *$20,000 withdrawn from the children's certificate of deposit*

Dong also contends that the trial court has double charged her for $20,000 withdrawn from the children's certificate of deposit at Bank of America in December 2007. In its statement of decision, the court reconfirmed a prior order[6] in which Dong was directed to repay $20,000 given to the children by the paternal grandmother. The statement of decision also charged Dong with receiving over $50,000 in funds which includes the $20,000 withdrawn from a Bank of America certificate of deposit in December 2007, thus charging her twice for the same withdrawal.

Dong's argument has no merit. Even assuming that her interpretation is correct, and the statement of decision twice refers to the same $20,000, what she fails to appreciate is the difference between being ordered to repay $20,000 twice and being ordered twice to repay $20,000. Dong does not dispute that, as early as January 2009, she was ordered to return this $20,000 plus interest. She essentially admits she never did so. The 2010 statement of decision merely reconfirms the 2009 order to repay that money, and includes those same funds as part of what she is ordered to reimburse the community. She was not ordered to repay $40,000 plus interest, but instead was ordered twice (perhaps three times now) to repay $20,000 plus interest.

C.      *Denial of expert CPA testimony*

Dong claims the trial court erred by refusing to allow her to present expert testimony from a CPA on the value of Winnov LP or the amount of Garbe's income available for support.

---

[6] Dong notes that the statement of decision incorrectly identifies the date of the order as "December 18, 2008," instead of the actual date, December 15, 2008. The December 15, 2008 order is itself labeled "Proposed Statement of Decision and Order," but that document was adopted by the trial court, after considering Dong's objections thereto, without change by order dated January 26, 2009.

9

### 1. Standard of review

"A court's decision to exclude expert testimony is reviewed for abuse of discretion." (*Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 467.) The test for the abuse of discretion standard is whether the trial court's ruling " 'exceeded the bounds of reason.' " (*Walker v. Superior Court* (1991) 53 Cal.3d 257, 272.)

### 2. There was no abuse of discretion in precluding expert testimony

Code of Civil Procedure section 2034.210 authorizes any party to "demand[] that all parties simultaneously exchange information concerning each other's expert trial witnesses . . . ." The demand must specify a date of exchange "50 days before the initial trial date, or 20 days after service of the demand, whichever is closer to the trial date . . . ." (*Id*., § 2034.230, subd. (b).) All parties must exchange expert designations on or before this date, either at a meeting of their attorneys, "or by a mailing on or before the date of exchange." (*Id*., § 2034.260, subd. (a).) The designation shall either list all persons whose expert opinion the designating party expects to offer at trial, or state that the party does not intend to offer any expert testimony. (*Id*., § 2034.260, subd. (b).) Most relevant for our purposes here, the trial court shall, "on objection of any party who has made a complete and timely compliance with Section 2034.260, . . . exclude from evidence the expert opinion of any witness that is offered by any party who has unreasonably failed to do any of the following: [¶] (a) List that witness as an expert under Section 2034.260. [¶] (b) Submit an expert witness declaration. [¶] (c) Produce reports and writings of expert witnesses under Section 2034.270. [¶] (d) Make that expert available for a deposition . . . ." (*Id*., § 2034.300.) However, a party who has failed to make a timely disclosure may move for "leave to submit that information on a later date." (*Id*., § 2034.710, subd. (a); see *id*., § 2034.300.)

As the March 2010 trial date approached, Garbe's attorney served Dong, then acting in propria persona, with a demand for exchange of expert witness information, due

10

on January 25, 2010. Dong replied, seeking a postponement of that date, a postponement of her deposition (scheduled for January 26, 2010) and a continuance of the trial date, explaining her employer was requiring her to travel to China for business from January 7 to February 1, 2010 and again in March 2010.

As the parties could not agree on Dong's extension requests, she filed a motion to continue the trial, postpone her deposition, and extend the due date for her to produce documents and comply with Garbe's expert witness demand. Garbe brought a countermotion to compel further production of documents, reset Dong's deposition to a date following her production of further documents, preclude her from presenting expert testimony from any witness that is not disclosed prior to the hearing date and preclude her from introducing any documents that were not produced in response to the request for further production. Dong filed no response to Garbe's motion.

At the February 11, 2010 hearing on the motions, Dong advised the court she contracted pneumonia while in China and had to be hospitalized. She provided hospital records, written in Chinese, to Garbe's counsel and the court, pointing out that "pneumonia" was handwritten on those records in English.[7] She blamed her business trip and her illness for failing to respond in a timely manner both to the expert witness disclosure demand and to Garbe's motion. Garbe's counsel produced a document Dong sent to him entitled "Petitioner's Expert Witness Disclosure," dated January 25, 2010, in which she indicated she "has no experts retained or to disclose at this time."

By minute order dated February 11, 2010, the trial court ordered Dong to appear for a deposition on March 11, 2010, produce the requested documents by March 1, 2010, and precluded her from having an expert testify on her behalf at trial.

---

[7] There is no evidence in the record disclosing who wrote that word on the document.

11

Prior to trial, Dong brought a motion in limine requesting the court to appoint a forensic accounting expert pursuant to Evidence Code section 730. The trial court denied the motion, finding it was "too late and . . . it really does do violence to the orders already made." However, the court indicated that the order was without prejudice and that Dong could renew the motion "once the evidence is in." It does not appear she did.[8]

We find no abuse of discretion by the trial court. Dong had ample time and opportunity to avail herself of an expert witness regarding the valuation of Winnov LP as well as the amount of income Garbe had available for support. The trial was initially set for September 2009, then continued to March 15, 2010 and, at Dong's behest, continued again to April 5, 2010. Dong was asked to exchange expert witnesses in December 2009, yet apparently never retained one during the entire time this dissolution proceeding was pending, and certainly never disclosed to the court that she had done so. She did not designate a forensic accounting expert witness, she did not submit declarations, produce reports or writings from such an expert, nor did she make any such expert available for deposition. Consequently, it was appropriate to preclude Dong from presenting a forensic accounting expert to testify on her behalf at trial.

Dong critiques the testimony offered and the report prepared by Garbe's expert witness, specifically regarding the methodology that witness used to determine how much Winnov LP was worth. Pointing to her own testimony on Winnov LP's value, Dong suggests that her estimate is more reliable and realistic than that of Garbe's expert. It is clear, however, the trial court found Garbe's expert witness to be more credible than Dong. (See *In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1099 ["The trial

---

[8] If she did, Dong has not provided a citation to the record where the motion was renewed. (Cal. Rules of Court, rule 8.204(a)(1)(C); *Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856.)

court sits as trier of fact and it is called upon to determine that a witness is to be believed or not believed. This is the nature of factfinding."].)

### D. Property characterizations

Dong challenges the trial court's determinations regarding the characterization of the following property: (1) a Vanguard account she established in 2004, found to be community property; (2) a 2004 Saab, found to be community property; and (3) a $100,000 gift from Garbe's mother upon marriage, found to be Garbe's separate property.

In his cross-appeal, Garbe challenges the trial court's determination that an apartment in Shanghai was Dong's separate property.

We find substantial evidence supports the trial court's characterization of each of these properties.

#### 1. Standard of review

Dong again urges us to employ a de novo standard of review, claiming that the property characterizations were primarily based on documentation, rather than conflicting testimony. The court's findings, however, were not based solely on its interpretation of various writings. It also heard testimony on the issue from Dong and Garbe, and its conclusions are therefore based to some degree on how credible it found that testimony. Accordingly, we shall uphold the trial court's characterizations of property to the extent they are supported by substantial evidence. (*In re Marriage of Zaentz* (1990) 218 Cal.App.3d 154, 162.) While it may be theoretically possible to overturn findings of fact or to reassess the credibility of a witness, these tasks are basically within the province of the trial court which is better suited to make such assessments. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925-926.)

#### 2. General principles relating to property characterization

Property acquired during marriage is presumed to be part of the community. (§ 760.) "The presumption applies when a [spouse] purchases property during the marriage

with funds from an undisclosed or disputed source, such as an account or fund in which [he or she] has commingled [his or her] separate funds with community funds." (*See v. See* (1966) 64 Cal.2d 778, 783.) The burden is on the spouse asserting its separate character to overcome the presumption. This can be done by tracing the acquisition to a source of separate property or funds. If the source is a commingled account, the burden can be difficult to overcome because of the following principle. "[I]f the separate property and community property interests have been commingled in such a manner that the respective contributions cannot be traced and identified, the entire commingled fund will be deemed community property pursuant to the general community property presumption of section 760." (*In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 823.)

There are two tracing methods a spouse may use to establish a separate property interest in an asset acquired during the marriage-direct tracing or family living expense tracing. "Under the 'direct tracing' method, the disputed asset . . . is traced to the withdrawal of separate property funds from the commingled account. This method requires *specific records* reconstructing each separate and community property deposit, and each separate and community property payment as it occurs. Separate property status cannot be established by mere oral testimony of intent or by records that simply total up all separate property funds available during the relevant period and all the separate expenditures during that period; such records do not adequately trace to the source of the purchase at the time it was made. [Citations.] [¶] Under the 'family living expense' or 'recapitulation' method, it is assumed that family living expenses are paid out of community property funds. [Citations.] Payments may be traced to a separate property source by showing community income at the time of the payments or purchase was exhausted by family expense, so that the payments or purchase necessarily must have been made with separate property funds. [Citations.] The recapitulation must be sufficiently exhaustive to establish not only that separate property funds were available to make the payments, but that they were actually used. [Citation.] As with direct tracing,

14

the record must demonstrate that community income was depleted at the time the particular asset was acquired." (*In re Marriage of Braud*, *supra*, 45 Cal.App.4th at pp. 823-824.)

In those cases, it is quite clear that tracing the purchase to separate funds, either through direct tracing or by use of the recapitulation method, must be accomplished with the use of specific records. These requirements have been held to be necessary to reserve the general presumption that property acquired during a marriage is community property. (See *In re Marriage of Stoll* (1998) 63 Cal.App.4th 837, 841-842.)

### 3. *The Vanguard account*

The statement of decision provides: "The Vanguard account was acquired with community property. Alleged tracing offered by [Dong] for separate property was not only insufficient but conclusive Vanguard was acquired with community property. The Vanguard Capital account is awarded to [Dong] with a community value of $39,016."

At trial, Dong testified that, for her birthday in February 2004, her father gave her a birthday card "with some traditional Chinese red envelope money" consisting of $25,000 in cash. Dong used this money to open the account with Vanguard. Since Vanguard did not accept cash, she first had to deposit it into the Washington Mutual account (account No. 4077-7) and then write a check to Vanguard. In support of her testimony, Dong introduced the following documents: (1) the birthday card from her father, in which he had written "Dear Diana, Happy Birthday to my Daughter it is for your gift $25,000 Y.S. Dong Feb/2004"; (2) a copy of the $25,000 check she wrote to Vanguard dated February 11, 2004; and (3) statements for an account with Vanguard in Dong's name only dated from February 17, 2004 to September 30, 2009.

The Washington Mutual account statements, however, do not reflect a lump-sum deposit of $25,000 in February 2004. Rather, Dong testified that the $25,000 was deposited in two tranches--the first deposit was on January 16, 2004, in the amount of $5,019.53 and the second deposit was made on February 11, 2004, in the amount of

15

$20,351.91. It is undisputed that Dong's salary from Winnov LP was also routinely deposited into this Washington Mutual account.

Dong's testimony and documents were insufficient to trace her deposit of the $25,000 cash gift into the Washington Mutual account in February 2004 before writing the $25,000 check to Vanguard. Her testimony that she received this cash in February, yet was somehow able to deposit $5,019.53 of that $25,000 in *January*, is not credible on its face. The trial court was justified in disbelieving her testimony regarding the means by which she opened the Vanguard account in the first place. All that could be established was that she received $25,000 from her father, and subsequently wrote a $25,000 check to Vanguard on the joint Washington Mutual account. She may have deposited some or perhaps all of her birthday money into that account, but her testimony regarding the deposits was insufficient to support her claim that the Vanguard account was opened with her separate property.

Consequently, we conclude substantial evidence supports the trial court's finding that the Vanguard account was acquired with community property.

### 4. The 2004 Saab

Regarding the 2004 Saab, the statement of decision provides: "The court finds all automobiles were acquired during marriage and are presumptively community property. Attempts to prove separate property interest in the vehicles lacked persuasive evidentiary support." The 2004 Saab was assigned a net community value of $11,000 and awarded to Garbe.

At trial, Dong testified that the Saab was purchased using a $40,000 gift from her father, and no loan was taken out to finance the vehicle. The gift from her father was in the form of a gift card, which she used to open a second account at Washington Mutual and pay the balance on the Saab. Specifically, she stated "My recollection is my father gave me $40,000 so I first wrote a check of 10,000 and then subsequently I paid off the car by different installments, from this account. But I don't remember the details."

16

According to her testimony, her father wrote on the gift card, "Dear Diana, This is $40,000 for you to buy new car." She said Garbe's name was not mentioned.

In support of her testimony, she introduced two checks, both written on August 7, 2004 and made out to "B&B Saab." One check for $10,000 was written on the joint Washington Mutual account and the second, for $31,641.52, was written on a different Washington Mutual account, ending in 8888.

When Dong was asked why Garbe's name was the only name on the title to the Saab, she responded that it was because he went to the Department of Motor Vehicles by himself to handle the registration while she stayed home with their two young children.

As discussed above, property acquired during marriage is presumptively community property. (§ 760.) Although Dong testified that she used a $40,000 gift card from her father to purchase the vehicle, the trial court obviously disbelieved her testimony. There was documentary evidence of payments for the car, but no documentary evidence to show $40,000 in income to Dong, from her father or from any other source outside the community. Dong suggests that the trial court erred because "there was no alternative rational explanation of a source for the $40,000 that went into the Saab," but her argument ignores the fact it was her burden to overcome the community property presumption. Her unsupported oral testimony of a windfall $40,000 gift card being used to purchase the Saab was insufficient to meet that burden.

### 5. *The $100,000 wedding gift*

The statement of decision awarded a $100,000 note from Garbe's mother to him as his separate property, finding "[Dong] conceded the note is the source of the loan to Winnov LP and her concession is sufficient tracing. Furthermore, the document establishes it was a note unrelated to [stepfather]'s note and was from [Garbe]'s mother indicating a gift to [Garbe] only, referring to [']you['] singular and not [']you['] plural. The court finds [Garbe]'s testimony on this issue to be credible."

17

The evidence presented at trial was undisputed. At the time of their marriage, Dong and Garbe received an envelope, addressed to both of them, from Garbe's mother and his stepfather. Inside was a note from Garbe's mother, written predominantly in French, which read "Bon jour 100,000$ pour ton marriage. With love." The note from Garbe's stepfather read, "Welcome! Welcome! Many trully [*sic*] 'congratulations'! This is only my written promise of what is to be your gift. Much love, Sean XX." The $100,000 gift was subsequently loaned to Winnov LP, with a promissory note showing Garbe as the lender.

Dong testified that the gift was for both her and Garbe. As Winnov LP needed money at the time, they discussed the matter and jointly agreed to loan the $100,000 to the company.

Garbe, via an offer of proof, testified "that the one hundred thousand dollars referred to in the note from his mother was a wedding gift to him, [']ton,['] singular, which was part of a loan that is now between the corporation and him." A previous offer of proof explained that "in French . . . , there is a distinction between [']you['] plural and [']you['] singular. When you say [']you['] singular, [']you['] is [']ton,['] and when you use plural, it's [']votre.[']"

Given the testimony and evidence presented, there was substantial evidence to support the trial court's conclusion that the $100,000 gift from Garbe's mother was Garbe's separate property. (See § 770, subd. (a)(2) [property acquired after marriage by gift is separate property].) Her note stated it was "pour ton," rather than "pour votre," which indicated her intent that the money was for him alone (singular), rather than for him and Dong (plural). Given that the only other evidence of Garbe's mother's intent was Dong's self-serving testimony that the money was intended for both of them, the trial court was justified in finding that the writing itself was more reliable.

18

### 6. *The Shanghai apartment*

As to the Shanghai property, the trial court found "there is substantial evidence to support the conclusion the Shanghai apartment was acquired prior to marriage by [Dong] and is confirmed as her separate property." In his cross-appeal, Garbe challenges this conclusion.

Dong testified that, in April or May 1997, her mother purchased an apartment in Shanghai, putting title in both their names. After her mother bought the property, Dong saw a deed with both their names on it, but she never obtained a copy of that deed. Following her mother's death, her mother's interest in the property passed to her father, but he subsequently gifted his interest to Dong, giving her 100 percent ownership of the apartment. Dong estimated the apartment was worth between $100,000 and $150,000 at the time of trial.

Garbe argues the trial court's finding the apartment was Dong's separate property is not supported by substantial evidence. He asserts that the trial court "found that the apartment was acquired *during* marriage," (italics added) and thus is presumed to be community property. The evidence to overcome the presumption that the apartment was community property was in Dong's control, yet she failed to produce any documentation to support her separate property claim.

The statement of decision, however, does not, as Garbe claims, find the Shanghai apartment was acquired during marriage. Rather, it expressly states the property "was acquired *prior to* marriage." (Italics added.) Consequently, there is no presumption that the property is community; rather, the presumption is that the apartment is separate property under section 770, subdivision (a)(1). The cases cited by Garbe to support his claim that Dong failed to meet her burden of proof to overcome the community property presumption are thus inapposite.

The trial court was justified in crediting Dong's testimony on this matter, without regard to however incredible it found her testimony on other subjects. There was

19

substantial evidence to support the trial court's finding that the apartment in Shanghai was Dong's separate property.

## III. DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.

 

 

 

_____
Premo, J.

 

WE CONCUR:

 

 

_____
Rushing, P.J.

 

 

_____
Elia, J.