[Civ. No. 17358. First Dist., Div. Two. May 21, 1958.]

MARJORIE B. TASSI, Plaintiff and Appellant, v. EDWIN TASSI et al., Defendants and Appellants.

Wallace B. Colthurst and Orlando J. Bowman for Plaintiff and Appellant.

Stark & Champlin, Franklin C. Stark and John F. Wells for Defendants and Appellants.

DOOLING, J.—Plaintiff Marjorie Tassi brought this action upon the death of her husband to recover from defendants one-half of various properties on the ground that these properties were gifts of community property made by her husband without her consent. She appeals from the judgment which held that 73 per cent of the property was her husband's

separate property at the time of the transfers. Defendants Edwin and Alma Tassi appeal from that portion of the judgment which held that plaintiff was not required "to elect to take either the said three trustee accounts specified for her or her one-half interest in the total of the community property . . ."

Plaintiff Marjorie and decedent Harold Tassi were married on January 31, 1942, and lived together until Harold died on February 19, 1953. At the time of the marriage decedent owned a wholesale meat business which he had purchased in 1938 for $400 or $500. The book value of the business at the time of Harold's marriage was $14,519.95.

After the marriage plaintiff continued to work for about 10 months, and thereafter worked part time in her husband's business. The company account books contained an entry in 1943 indicating an additional investment at that time of $27,615.01 but there was no direct evidence as to the source of those funds. Income tax returns reported by decedent indicated that the business earned $419,993.17 during the 11 years of marriage. The evidence showed that plaintiff's husband withdrew from the business $447,805.75 from the date of marriage until his death.

During the marriage in 1947 and 1948 decedent opened seven trustee accounts, three for his wife, totaling $73,962.49, and four for his brother totaling $122,514.26. Three days before the decedent's death, Edwin wrote himself a $20,000 check on decedent's bank account. In 1951 decedent gave to Edwin five $1,000 United States Bearer Bonds, and in 1946 purchased for him 300 shares of corporate stock. All of these transactions were without appellant's knowledge or consent.

There was evidence that decedent made various investments in securities and of transferring of sums between bank accounts.

The trial court found "(t)hat the source of the funds which set up the accounts and purchased the securities and bonds . . . was the earnings and profits of a wholesale meat business known as Associated Meat Company." It found that the decedent set up the trustee bank accounts with the intention of passing the money to the beneficiaries with a minimum of expense and delay in the event of his death. The court found further that the meat company was at all times decedent's separate property and that the earnings and profits from the business "are allocable 27% to the community property of decedent and plaintiff and 73% to the separate prop-

erty of decedent.'' It was also found that the transfers to defendant Edwin Tassi ''were the community property of decedent and plaintiff to the extent of 27% thereof . . .''

## Defendants' Appeal

The defendants urge on appeal a single question, that as to the seven trustee bank accounts, three created for the plaintiff wife and four for the defendant brother, plaintiff was put to an election either to take under the three trustee accounts created for her and waive her claim to a community property interest in the four trustee accounts created for the brother, or in the alternative to abandon her claim to the whole of the three trustee accounts created for her and claim only her community interest in all seven accounts.

The essentials for the application of the doctrine of election are thus stated in 2 Pomeroy's Equity Jurisprudence, 5th edition, section 462, page 332: ''The essential facts presenting an occasion for the doctrine of election are: A gives to B property belonging to C, and by the same instrument gives to C other property belonging to himself. The equitable doctrine upon these facts, briefly, is: C has two alternatives: 1. He may elect to take under the instrument, and to carry out all its provisions; he will then take A's property, which was given to him, and B will take C's property. 2. He may elect against the instrument. In that case . . . he must surrender . . . so much of such benefits as may be necessary to compensate B for the disappointment he has suffered by C's election to take against the instrument.''

As applied to wills the doctrine was thus stated in *Williams* v. *Williams,* 170 Cal. 625, 627-628 [151 P. 10]: ''Where property to which one may have a valid claim . . . is disposed of by will in violation of those rights, while at the same time other property, to which the claimant would not be entitled, is devised to the claimant, an election is forced. The claimant cannot at the same time take the benefits under the will and repudiate the losses. He must either accept the terms of the will *in toto* or reject them *in toto.*''

While the doctrine of election has been most frequently applied to wills, it is also applicable to any instrument creating property rights. (*Mazman* v. *Brown,* 12 Cal.App.2d 272 [55 P.2d 539]; 2 Pomeroy's Equity Jurisprudence, 5th ed., § 470, p. 347.)

The first fact to be noted in determining whether

the doctrine of election is applicable to the trustee accounts in question is that each account was not only separately created, but each account was created at a different date. The accounts for the benefit of the wife were respectively created on April 18, 1945; September 24, 1947; and September 21, 1950. Those for the benefit of the brother were opened on September 25, 1947; August 27, 1948; February 6, 1948; and September 12, 1951. The signature cards by which the several accounts are created make no reference of any sort one to the other. Each, so far as appears on the face of the document creating it, is an entirely independent transaction from any of the others. It is stated by Pomeroy in the quotation above set out that the doctrine of election applies where "A gives to B property belonging to C, and *by the same instrument* gives to C other property belonging to himself." (Emphasis ours.)

In none of the cases cited by defendants-appellants was an election compelled where the inconsistent rights were created by separate documents none of which on its face makes any reference to the others. In *Estate of Ettlinger,* 73 Cal.App.2d 967 [167 P.2d 738], the claim was made that the will, which made no mention of two insurance policies in favor of testator's daughters, and the two policies must be construed together so as to compel the widow to elect between taking under the will and waiving her community interest in the policies, or waiving her rights under the will and taking only her community interest. We said at pages 970-971:

"Respondents further argue that the will and the policies must be construed together to put appellant to an election. No authority is cited to support this argument and we have found none. The case is not similar to *Mazman* v. *Brown,* 12 Cal.App.2d 272 [55 P.2d 539], where the widow was made a beneficiary of the policy itself and was held by virtue of that fact to be put to her election to take under the policy or to claim her community interest and renounce her rights as beneficiary. Appellant is not here claiming any property disposed of, or even referred to, in the will, and her claim is not inconsistent with any of the will's provisions. If she is put to an election here then every widow to whom a husband left any separate property by will, where he also left a life insurance policy paid for in whole or in part with community funds with someone other than the wife named as beneficiary, would be put to a similar election."

If defendants-appellants are correct in their contention that the several accounts must be construed together to put the wife to an election no good reason appears why the same rule would not apply to separate deeds, separate life insurance policies or other separate transactions of a similar character, by some of which the wife benefited and by others of which she was deprived of community property rights. To so hold would open up a host of future controversies the uncertainties of which might perplex the courts for years and leave the respective rights of claimants under separate instruments, none of which on their faces made any reference to the others, in a state of doubt and confusion. The rule as previously applied, limiting the doctrine of election to those cases where the necessity of election appears from the face of the instrument under which the claimant takes, is simple of application. In the absence of controlling authority we are satisfied that it should not be extended beyond that point.

Defendants-appellants, over objection, were permitted to introduce evidence of oral declarations of the decedent that the several bank accounts were all a part of a consistent scheme to dispose of the funds therein upon death without necessity of administration. It was thus sought by evidence of these oral declarations to prove *dehors* the instruments creating the accounts that it was the intention of the decedent to put his widow to an election. It was expressly held in *Estate of Claussenius*, 96 Cal.App.2d 600, 613 [216 P.2d 485], where oral testimony was sought to be admitted to prove the testatrix' intention to put her husband to an election that "it is the law that the intention of the testator to require his beneficiary to elect whether to take under will or under statute must appear from the will itself." This is the uniform rule in other jurisdictions. (*McDonald* v. *Shaw*, 92 Ark. 15 [121 S.W. 935, 28 L.R.A.N.S. 657], and cases collected in the note to this case in 28 L.R.A.N.S. 657 et seq.; 2 Pomeroy's Equity Jurisprudence, 5th ed., § 473a, p. 353.)

Defendants-appellants rely on Probate Code, section 101, that "(s)everal testamentary instruments executed by the same testator are to be taken and construed together as one instrument." The section is limited to "testamentary instruments," i.e. wills, and has no application to documents other than wills. We conclude that the trial court properly held that plaintiff widow was not put to an election.

*Plaintiff's Appeal*

 Plaintiff-appellant widow first attacks the finding that the meat business was the separate property of decedent husband. The parties were married on January 31, 1942. The books of the business show an additional capital investment on January 1, 1943, of $27,615.01. An accountant testified as to this entry, that he did not know whether this money was actually put into the business but if it was that it could not have been earnings from the business. No other source of earnings by decedent between the date of the marriage and January 1 of the year following was shown. Plaintiff-appellant worked for 10 months after her marriage at $175 per month, which aggregates only $1,750. The circumstances would support an inference that if $27,615.01 was actually put into the business on January 1, 1943, it must have come from property acquired by decedent before marriage. Plaintiff-appellant relies upon the presumption in favor of the community character of the property, but this presumption is of less weight where the marriage has existed but a short time. (*Estate of Duncan,* 9 Cal.2d 207, 217 [70 P.2d 174].) Here the parties had been married less than a year when the book entry showing this investment was made and for that year the total net income of the business was only $13,767.48. Considering the earning power of the parties during that brief period and the accountant's testimony that, if actually made, this investment could not have come from earnings of the business the inference of the court that it came from separate property cannot be held not to find substantial support in the evidence. "Circumstantial as well as direct evidence may be used to rebut the presumption that property acquired during marriage is community property." (*Estate of Doran,* 138 Cal.App.2d 541, 550 [292 P.2d 655].)

 The parties stipulated that the monies which went into the trust accounts and with which the stock was purchased "came initially directly or indirectly from moneys which were earned in the Associated Meat Company." Relying on the rule that where community and separate property is commingled to the extent that the two can no longer be segregated the commingled property is regarded as community property (*Pope* v. *Pope,* 102 Cal.App.2d 353 [237 P.2d 312]) plaintiff-appellant argues that the stipulation that these monies came "indirectly" from earnings of the meat company will not support the finding that to the extent that these monies were originally the separate property of decedent they

retained that character. ▇ "The presumption that property acquired during marriage is community is controlling only when it is impossible to trace the source of the specific property. . . . ▇ If the exact amount of money allocable to separate property and the exact amount of money allocable to community property deposited in a bank account can be ascertained, the money allocable to separate property is not so commingled that all of the funds become community property. It can be traced." (*Thomasset* v. *Thomasset*, 122 Cal. App.2d 116, 124 [264 P.2d 626].) ▇ When the stipulation was offered and accepted counsel for defendants had an accountant on the stand and was starting to trace the source of the trust accounts. When the stipulation was accepted he offered no further proof on the subject. The stipulation that these funds came "indirectly" from earnings of the business must be held to mean that where they did not come directly from the business they could be traced through whatever form they took to earnings of the business. Counsel are attempting to put too narrow a construction on the stipulation when they argue that under the stipulation funds traced "indirectly" to earnings of the business must be held to have lost their character of separate earnings. Tracing the funds "indirectly" to earnings of the business fairly construed means tracing their character as earnings of the business through whatever transmutations they may have undergone. In view of the stipulation counsels' reliance on cases such as *Estate of Adams*, 132 Cal.App.2d 190 [282 P.2d 190], where the effort to trace was ineffectual are not in point.

▇ The claim that by filing income tax returns showing all of his earnings as community property decedent must be held to have transmuted them into community property is answered by *Balkema* v. *Deiches*, 90 Cal.App.2d 427 [202 P.2d 1068], and *Hopkins* v. *Detrick*, 97 Cal.App.2d 50 [217 P.2d 78]. The accountant who prepared the income tax returns testified that he showed all income as community without consulting decedent and "an appellate court cannot say that the trial court abused its discretion in believing the explanation of the form of these returns given by . . . [the] tax adviser. . . ." (*Balkema* v. *Deiches, supra,* 90 Cal.App.2d p. 431.)

▇ As to the $5,000 in government bonds there was no stipulation as to the source of the money with which they were purchased and plaintiff-appellant insists that as to them there is nothing to support the finding that they were 73 per

cent separate property. Since the evidence showed no source of earnings during the marriage other than income from the business and to a small extent from securities purchased with earnings from the business we conclude that the finding is sufficiently supported.

Plaintiff-appellant's main attack is on the sufficiency of the evidence to support the allocation of earnings from the business in the ratio of 73 per cent separate property and 27 per cent community property. It is the duty of the court to allocate earnings from a business which is the separate property of a husband and in which the husband is actively employed, finding as separate property the portion of the earnings properly attributable to the business, and as community property the portion of the earnings properly attributable to the husband's efforts. The evidence showed that during the marriage decedent withdrew $447,805.75 from the business and paid living expenses of $44,093.16. No attempt was made by decedent to allocate these withdrawals between salary and business earnings. Decedent devoted full time to the management of the business.

Two approaches have ordinarily been made to the allocation of earnings in such cases: 1. to allow interest on the capital investment of the business, allocate such interest as separate property, and treat the balance as community earnings attributable to the efforts of the husband (*Pereira* v. *Pereira*, 156 Cal. 1 [103 P. 488, 13 Am.St.Rep. 107, 23 L.R.A.N.S. 880]) ; 2. to determine the reasonable value of the husband's services in the business, allocate that amount as community property, and treat the balance as separate property attributable to the normal earnings of the business. (*Huber* v. *Huber*, 27 Cal.2d 784 [167 P.2d 708].) The court adopted the latter formula.

There was evidence of witnesses familiar with the wholesale meat business that the reasonable salary for the general manager of such a business was from $10,000 to $15,-000 per year. Plaintiff-appellant argues that the hypothetical questions on which this testimony was based were not based upon the evidence, particularly in that they did not include the factors that this was a small, wholly owned business. The court has a wide discretion in the admission of expert testimony (*Guardianship of Jacobson,* 30 Cal.2d 312, 324 [182 P.2d 537] ; 19 Cal.Jur.2d, Evidence, § 288, p. 14) and the salary customarily paid to general managers of wholesale meat businesses is relevant and competent evidence of the reason-

able value of such services in a particular business of that character. The difficulty of obtaining evidence limited to small, wholly owned businesses is obvious. The salary allowed by such owners to themselves lies entirely in their own discretion and the surest standard would not be what such owners were accustomed to allow to themselves but rather what independent employers were in the habit of paying others for similar services in the free give and take of the open market. We find no error in the admission of this evidence.

The evidence is sufficient to support the trial court's conclusion that the reasonable value of decedent's services did not exceed $15,000 per year. Plaintiff-appellant argues that only where the husband has in fact allocated a portion of earnings to salary is the formula adopted by the court allowable. It is true that in *Gilmore* v. *Gilmore*, 45 Cal.2d 142, 150 [287 P.2d 769], and *Harrold* v. *Harrold*, 43 Cal.2d 77, 80 [271 P.2d 489], there had been a fixed amount drawn by the husband-owner as salary. But in *Huber* v. *Huber, supra*, 27 Cal.2d 784, in which case the husband had drawn $150 from the business every two weeks, without allocating any part to salary, and there was testimony "that the business would warrant a salary of $150 per month to defendant" the court said (p. 792) : "Under these circumstances the court was justified in reaching the conclusion that the earnings allocable to community property consisted of $1,800 per year. . . ."

"In applying this principle of apportionment the court is not bound either to adopt a predetermined percentage as a fair return on business capital which is separate property nor need it limit the community interest only to the salary fixed as the reward for a spouse's service but may select whatever formula will achieve substantial justice between the parties. . . .

"It is primarily a question of fact 'for the court to determine what portion of the profits thereafter arises from the use of this (separate) capital and what part arises from the activity and personal ability of the husband.' " (*Logan* v. *Forster*, 114 Cal.App.2d 587, 600 [250 P.2d 730].)

There was testimony that the period of World War II and the Korean War which followed it were years of high profits in the meat business, and an analysis of the customers' accounts showed that almost one-third of the total sales volume during the entire marriage was to purchasers who were already customers of the business when the parties were married. From this evidence the court was justified in finding that

the business earnings were chiefly attributable to the business as such rather than to decedent's services. Plaintiff-appellant points to the scarcity of meat and rationing as offsetting factors to the high wartime profits but the balancing of these factors is the appropriate function of the trial court and not of this court on appeal.

Plaintiff-appellant complains that the trial court should not have deducted living expenses from the portion of business earnings attributable to community property, but "(i)t is presumed that the expenses of the family are paid from community earnings" (*Huber* v. *Huber, supra,* 27 Cal.2d 784, 792; *Thomasett* v. *Thomasett, supra,* 122 Cal.App.2d 116, 126) and the court would therefore be justified in making such deduction.

The findings were directed to the ultimate facts as alleged in the pleadings. This was sufficient and there was no error in the failure of the trial court to make more specific findings of the probative facts on which the ultimate facts depended. (24 Cal.Jur., Trial, § 203, pp. 968-969.)

Since income tax returns showed all income as community it is claimed that the portion of earnings allocated to separate property should have been charged with a greater than pro rata share of such taxes, but since all income received the benefit of the lower tax bracket we can see no impropriety in allocating the tax burden accordingly.

Since earnings were not allowed to accumulate in the business, and the business investment was the separate property of decedent we find no substance in the complaint that some part of the increase in the value of the business should have been allocated to community property.

Judgment affirmed.

Kaufman, P. J., and Draper, J., concurred.

A petition for a rehearing was denied June 20, 1958, and the petitions of plaintiff and appellant and defendants and appellants for a hearing by the Supreme Court were denied July 16, 1958. Schauer, J., was of the opinion that the petition should be granted.