Filed 12/3/14  Marriage of Bailey CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of CECILY BUDA (BAILEY) and RICHARD BAILEY. | |
| CECILY BUDA (BAILEY),<br><br>        Appellant,<br><br>v.<br><br>RICHARD BAILEY,<br><br>        Appellant. | A136564<br><br>(Contra Costa County<br> Super. Ct. No. D04-02765)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on November 18, 2014, be modified as follows:

1.     On page 4 of the opinion, the first sentence in the first paragraph should be modified as follows:  remove the reference to "another of the trial court's findings" and replace it with "Cecily's assertion".

The new sentence should read:  "Shortly before this trial, Richard made known his intent to challenge Cecily's assertion that the property at 205 Daisy Avenue in Lodi was Cecily's separate property."

2.      On page 4 of the opinion, in the third paragraph on that page, the fourth sentence of that paragraph should be modified as follows: remove the reference to "lost profits" and replace it with "lost wages."

     The new sentence should read: "In addition, the trial court found the net proceeds of Cecily's civil lawsuit settlement to be her separate property, while reserving jurisdiction over her still-pending worker's compensation claim for lost wages."

There is no change in the judgment. Appellant Cecily Buda (Bailey's) petition for modification is deemed to be a petition for rehearing, and is denied.

DATED:                             _____ P. J.*

* Justice Jenkins and Pollak concurred.

Filed 11/18/14 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of CECILY BUDA (BAILEY) and RICHARD BAILEY. | |
| CECILY BUDA (BAILEY),<br><br>    Appellant,<br><br>v.<br><br>RICHARD BAILEY,<br><br>    Appellant. | A136564<br><br>(Contra Costa County<br> Super. Ct. No. D04-02765) |

This is an appeal and cross-appeal in marriage dissolution proceedings involving Cecily Buda (formerly Bailey) and Richard Bailey.[1]  Pursuant to a series of interlocutory and final judgments, the marriage of Cecily and Richard was dissolved, permanently resolving issues relating to division of property, rights to reimbursement and attorney fees and costs, among other issues.  Both parties now contend the June 11, 2012 Judgment on Reserved Issues must be reversed based on a variety of purported errors.  We reverse this judgment in part, affirm it in part, and remand the matter to the trial court for further consideration of certain issues in light of the conclusions reached herein.

---

[1]    For ease of reference, while intending no disrespect, we refer to the parties by their first names, Cecily and Richard.

1

**FACTUAL AND PROCEDURAL BACKGROUND**

Cecily and Richard were married in 1994, and permanently separated in June 2004. The marriage yielded no children.

At the time of marriage, Cecily and, to a lesser extent, Richard separately owned significant assets. Cecily's assets included real property (including a residence in Lafayette, a condominium in Concord, and a 26 percent interest in real estate in Walnut Creek), two cars, and approximately $35,000 in a Merrill-Lynch bank account. Richard's assets, in turn, included a residence in Vallejo, several vehicles, and approximately $8,000 in cash. To protect these assets, shortly before marriage, the parties entered into a premarital agreement (hereinafter, PMA). This agreement, among other things, provided that each party had full ownership over his or her separate property held at the time of marriage, and that any property acquired during marriage, in which title is taken in the name of Cecily or Richard alone, and all accumulations therefrom, would be and would remain the separate property of the acquiring party. In addition, the PMA provided that each party had the right to sell, use, transfer or exchange his or her separate property free of any claim of the other party, and that all debts and liabilities incurred on behalf of a party's separate property would be the sole responsibility of the party owning such property. Also relevant, the PMA provided that community debts would be paid with community funds and that, should community funds be insufficient to pay a community obligation, one party could use his or her separate resources to cover the community obligation, and then receive reimbursement for this use of separate resources from subsequently-acquired community property.

Years later, in 1999, Cecily sustained a disabling work-related injury requiring eight surgeries, five of which occurred prior to separation. She subsequently brought a personal injury lawsuit against her employer, which she then settled for $300,000 in medical expenses and pain and suffering damages. Cecily's net proceeds amounted to $197,909.82, from which she reimbursed the community $63,000 for medical expenses. Cecily's workers' compensation claim for lost wages arising from this injury remains pending.

2

On June 10, 2004, following the parties' separation, Cecily filed the underlying petition for dissolution of marriage. Early on in these proceedings, a stipulation and *pendente lite* order was filed with respect to spousal support. Specifically, the court ordered Cecily to pay spousal support to Richard in the amount of $1,500 per month. In addition, the trial court set a hearing to determine the validity, construction and interpretation of the PMA.

In April 2005, following the bifurcated trial, the trial court upheld the validity and enforceability of the PMA, noting, among other thins, that both parties executed the agreement following a lengthy drafting and review process during which they were represented by separate counsel.

Trial was continued again the following year, after which the court issued the March 27, 2006 Judgment on Reserved Issues. Pursuant to this judgment, the trial court found, among other things, that the parties' residence during marriage, 150 Castle Court in Lafayette, was Cecily's separate property. In addition, the court found that the community was entitled to $63,809.13 in reimbursement from Cecily, of which amount $32,904.57 was payable to Richard as his share of the community reimbursement. Over two years later, in late 2009, Richard filed a motion to vacate this judgment. Relying on *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, Richard argued that he was entitled to retry the issue of whether the Castle Court property was separate or community property in light of his lack of opportunity in the first trial to present direct examination testimony.[2] He also sought significant sums in reimbursements. The trial court granted Richard's motion to vacate the 2006 judgment and, thus, vacated the 2006 Judgment on Reserved Issues and set another trial date for March 2010.

---

[2] Richard also moved in May 2006 to vacate the judgment with respect to the finding that the Castle Court property was Cecily's separate property. In this earlier motion, he argued Cecily had made misrepresentations in court regarding the property's tax payments. In ruling on this earlier motion, the trial court declined to revisit the issue of the characterization of the Castle Court property, but agreed to reconsider the issue of reimbursements owed from or to the community.

3

Shortly before this trial, Richard made known his intent to challenge another of the trial court's findings – that the property at 205 Daisy Avenue in Lodi was Cecily's separate property. As a result, trial was continued to July 26, 2010.

During this second trial, held over eight days between July 2010 and May 2011, all remaining issues were heard, with the parties presenting both live testimony and documentary evidence. After taking the matter under submission, the trial court filed a tentative decision/statement of decision on July 29, 2011. Both parties then filed lengthy objections to this tentative decision.

Finally, on June 11, 2012, the Judgment on Reserved Issues was issued. Pursuant to this judgment, the trial court found, among other things, that both the Castle Court property in Lafayette and the Daisy Avenue property in Lodi were Cecily's separate property, and that she was entitled to $8,830.65, plus interest, in reimbursement for spousal support payments she made to Richard prior to the 2005 bifurcated trial on the validity of the PMA (which amount Cecily could offset against any attorney fees awarded to Richard). The trial court also denied both parties' requests for reimbursement, including Cecily's various claims based on her expenditures of separate funds to pay down community debt and Richard's claims for community property reimbursement from certain of Cecily's investment and other bank accounts. In addition, the trial court found the net proceeds of Cecily's civil lawsuit settlement to be her separate property, while reserving jurisdiction over her still-pending workers' compensation claim for lost profits. Finally, the court ordered Cecily to pay Richard's attorney $60,000 in attorney fees and costs pursuant to Family Code section 2030 in monthly installments. This appeal and cross-appeal followed.

## DISCUSSION

Cecily raises three arguments on appeal. First, Cecily contends the trial court erred in declining to award her *Epstein* credits (see *In re Marriage of Epstein* (1979) 24 Cal.3d 76) to reimburse her for separate funds she used to pay down community property debt after the couple had separated but before their marriage was dissolved. Second, she contends the trial court erred in declining to award her over $80,000 in reimbursement for

4

separate funds she paid toward community debt before separation. And thirdly, she contends the trial court abused its discretion in awarding Richard $60,000 in attorney fees and costs by failing to address certain mandatory factors under Family Code section 2030, the applicable statute.

Richard, in turn, also raises several arguments in his appeal.[3] Richard contends that, as a general matter, the trial court erred in misinterpreting, misapplying and/or failing to apply the PMA to the parties' disputes. More specifically, Richard contends the trial court erred in finding two parcels of real property acquired during marriage were Cecily's separate property – to wit, a residential property at 150 Castle Court in Lafayette (Castle Court property), and an income-producing rental property at 205 Daisy Avenue in Lodi (Lodi property). Finally, Richard contends the trial court erred in awarding to Cecily the net proceeds of a settlement in the civil lawsuit she filed against her former employer.

We address each contention in due order following a brief discussion regarding the relevant standard of review.

## I. Standard of Review.

Generally, "the trial court has broad discretion to achieve equity in the distribution of marital assets." (*In re Marriage of Zaentz* (1990) 218 Cal.App.3d 154, 164.) "Courts have frequently pointed out that the disposition of marital property is within the trial court's discretion, by whatever method or formula will 'achieve substantial justice between the parties.' (*Tassi v. Tassi* (1958) 160 Cal.App.2d 680, 691 [325 P.2d 872]; see also *In re Marriage of Poppe* [(1979)] 97 Cal.App.3d [1,] 11.) Similarly, ' " 'In making such apportionment between separate and community property our courts have developed no precise criterion or fixed standard, but have endeavored to adopt that yardstick which is most appropriate and equitable in a particular situation . . . .' [Citations.]' (*Beam v. Bank of America* (1971) 6 Cal.3d 12, 18 [98 Cal.Rptr. 137, 490 P.2d 257].)" (*In re Marriage of Hug* (1984) 154 Cal.App.3d 780, 791.)

---

[3] Richard did not file a Respondent's Brief in Cecily's appeal.

Further, while there is a presumption that property acquired during marriage is community property, this presumption may be overcome by the term(s) of a valid premarital agreement or other sufficient writing. (Fam. Code, § 2581; *In re Marriage of Weaver* (2005) 127 Cal.App.4th 858, 865; *In re Marriage of Benart* (1984) 160 Cal.App.3d 183, 189, disapproved on other grounds in *In re Marriage of Fabian* (1986) 41 Cal.3d 440, 451 fn. 13.) A premarital agreement is first and foremost a contract, subject to ordinary rules of contract interpretation and enforceability under ordinary circumstances. (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 13.) The proper interpretation of a particular contract is, of course, a legal issue reviewed on appeal de novo. (*In re Marriage of Carlton* (2001) 91 Cal.App.4th 1213, 1217.) On the other hand, where a party challenges the trial court's factual findings in support of its final judgment in a marriage dissolution case, our review is limited to a determination of whether substantial evidence exists in support of such findings. (*In re Marriage of Drake* (1997) 53 Cal.App.4th 1139, 1151.) This substantial evidence rule extends to extrinsic evidence admitted by the trial court to interpret a premarital agreement or other contract. Thus, "where extrinsic evidence has been properly admitted as an aid to the interpretation of a contract and the evidence conflicts, a reasonable construction of the agreement by the trial court which is supported by substantial evidence will be upheld." (*In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 746-747.)

"On review for substantial evidence, we examine the evidence in the light most favorable to the prevailing party and give that party the benefit of every reasonable inference. (*In re Marriage of Catalano* (1988) 204 Cal.App.3d 543, 548.) We accept all evidence favorable to the prevailing party as true and discard contrary evidence. (*Ibid*.)" (*In re Marriage of Drake, supra,* 53 Cal.App.4th at p. 1151.)

## II.  Challenges on Appeal Relating to Cecily's Right to Reimbursement.
### A.  Richard's Challenge to the Court's PMA Interpretation.

Richard contends the trial court misinterpreted the PMA when determining whether Cecily was entitled to reimbursement for her use of separate resources to pay for

6

certain community obligations.[4]  Specifically, he challenges the court's interpretation of paragraph 4.c of the PMA, which provides in relevant part:  "If community income or community property funds are insufficient to pay all community obligations, the balance may be paid from the separate income or separate property funds of either or both parties and the party who contributes such separate income or separate property funds shall be entitled to reimbursement for such expenditures from community property thereafter acquired, without interest; provided, however, that the parties may agree at the time of the advance or at any time thereafter that the party who contributes such separate income or separate property funds shall not be entitled to reimbursement, in which event the contribution of separate income or separate property funds shall be deemed a gift to the community."

According to Richard, the trial court erred in interpreting this provision because "[a]ny reasonable person would believe that both parties would need to be in agreement to the debt and the use of the separate property, or affording an opportunity to make other arrangements."  We disagree.  The language of paragraph 4.c is quite clear.  Simply, the provision grants each party the right to be reimbursed for his or her use of separate funds or resources to cover community obligations.  There is no language in this provision conditioning a party's right to reimbursement for his or her use of separate funds or resources on a community obligation on both parties having agreed to reimbursement prior to such use.  Rather, the provision states the opposite:  A party's contribution of separate funds or resources toward community debt may be deemed *a gift* to the community only if the parties agree to such treatment.  Given the clarity of the relevant contractual language, we decline Richard's request to imply any additional term or condition.  (E.g., *American-Hawaiian S.S. Co. v. Home Sav. & Loan Ass'n* (1974) 38

---

[4]     As we discuss at length in Section II.B., *post*, the trial court found that Cecily had adequately traced her payment of community debts with her separate property.  However, the court nonetheless denied certain of Cecily's reimbursement requests on the ground that no community estate remained.  We address Cecily's challenge to this ruling below.

7

Cal.App.3d 73, 82 ["Courts through the medium of construction may not put into contracts provisions that are not already there"]; Civ. Code, § 1638.)

### B. Cecily's Challenge to the Denial of her *Epstein* Claims.

Cecily contends the trial court erred in denying her request for *Epstein* credits for her post-separation payment with separate funds of community credit-card debt and line-of-credit debt. (See *In re Marriage of Epstein, supra,* 24 Cal.3d at p. 84 [spouses are entitled to reimbursement for their post-separation payment of community debt with separate property] [*Epstein*].) More specifically, Cecily contends the trial court failed to address her request for *Epstein* credits in its July 29, 2011 tentative statement of decision, and then, after she raised an objection to this omission, the court merely denied her request without substantive analysis in the ultimate judgment, which she contends was improper.[5] We agree.

The record reflects that the trial court found Cecily had adequately traced her payment of community debts with her separate funds, thus establishing her right to reimbursement. Nonetheless, based upon paragraph 4.c of the PMA, the trial court denied reimbursement to Cecily on the ground that no community estate currently existed.[6] Recall that paragraph 4.c provides that if Richard or Cecily uses separate funds

---

[5] Cecily acknowledges the court addressed her reimbursement claims as a general matter, albeit without reference to *Epstein* and its application to post-separation claims.

[6] Richard disputes the trial court's finding that Cecily established her right to reimbursement. In doing so, Richard contends "[n]o bookkeeping was entered into evidence as to any debt owed to Cecily from the community during the marriage," and that "[Cecily's] claim is based only on what she put into the account; there is no break down as to what community expenses it covered." However, as stated above, the trial court found Cecily had adequately traced her payment of community debts with her separate funds, thus establishing her right to reimbursement. In doing so, the trial court relied on Cecily's testimony, and the accounting performed by her experts, demonstrating that she had paid a total of $106,894.14 towards the parties' credit-card debt and line-of-credit debt after their date of separation. On appeal, Richard points to no particular reimbursement claim by Cecily that was not appropriately traced. Indeed, Richard fails to identify any particular evidence whatsoever relating to Cecily's accounting. As such, Richard provides this court no basis for concluding the trial court erred in finding that Cecily had demonstrated a right to be reimbursed. (*Lewis v. County of Sacramento*

8

to make a payment to the community, he or she "shall be entitled to reimbursement for such expenditures from community property thereafter acquired." The trial court thus reasoned that because, in this case, there was no community property remaining in the estate, there were no funds from which to reimburse Cecily for her expenditures. According to Cecily, even assuming this logic would apply to general reimbursement claims, it does not apply to *Epstein* claims given the significant policies underlying them. The relevant law is not in dispute.

In *Epstein*, the California Supreme Court held that a spouse was entitled to be reimbursed for his or her post-separation payment of community debt with separate property, thereby reversing the general presumption in marriage cases that a spouse's payment of community debt with his or her separate property is intended to be a non-reimbursable gift to the community. (24 Cal.3d at p. 84.) In doing so, the court reasoned that, ordinarily, when parties separate in anticipation of divorce, "the rational basis for presuming an intention on the part of the paying spouse to make a gift is gone." (*Ibid*.) The court also noted that, during separation, finances are often stretched and emotions heightened. Under such circumstances, authorizing reimbursement is more likely to encourage a spouse to pay community debt after separation, which, in turn, would help minimize "financial and emotional disruption."[7] (24 Cal.3d at pp. 84-85.)

---

(2001) 93 Cal.App.4th 107, 116 ["it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the . . . issues the appellant claims are present by citation to the record and any supporting authority. In other words, review is limited to issues which have been adequately raised and briefed"].)

[7]     The California Supreme Court acknowledged that, in certain situations, reimbursement for post-separation payment of community debt would be inappropriate, for example, "where the spouses agreed there would be no reimbursement; where the spouse intended a gift; where payment was made toward a debt for the acquisition or preservation of an asset the spouse was using and the amount paid was not substantially in excess of the value of the use; where the payment constituted a discharge of the spouse's duty to pay child or spousal support." (*In re Marriage of Reilly* (1987) 196 Cal.App.3d 1119, 1123, fn. omitted, citing *Epstein, supra*, 24 Cal.3d at pp. 82-84.) There is no contention here, however, that any of these circumstances are present.

Post-*Epstein*, California courts have recognized additional rationales for permitting reimbursement to a spouse who pays community debt after separation – to wit, simple fairness. "At trial the court must order an equal division of community property. If one spouse has used separate property to pay community debts, failure to provide reimbursement from the community, in effect, would result in an unequal division of the community property." (*In re Marriage of Hebbring* (1989) 207 Cal.App.3d 1260, 1271 [holding that the limitations on reimbursement for separate property contributions to the acquisition of community property set forth in Civil Code section 4800.2, Family Code section 2640's predecessor, do not apply to a spouse's request for *Epstein* credits].)

In this case, we agree with Cecily that the denial of her *Epstein* claims resulted in an unequal division of the parties' community property. While the trial court may have been correct that the community's asset pool was depleted at the time of judgment, there were alternative means available to protect Cecily's financial interests and to ensure fair distribution of the parties' property that the court failed to consider. Indeed, Cecily herself identifies several such alternatives for making her whole, including ordering reimbursement from the still-undetermined value of her lost wages claim (over which the trial court has reserved jurisdiction), or ordering an offset against the significant attorney fee award she was ordered to pay on Richard's behalf. (See also *In re Marriage of Bergman* (1985) 168 Cal.App.3d 742, 761 [courts have discretion to use promissory notes for relatively short periods at reasonable interest rates in order to equalize the division of community property].)

Here, there is no evidence the trial court considered these or any other potential sources of community property. And, while it is no doubt true that a trial court generally has considerable discretion to decide reimbursement requests and that full reimbursement is not required in all cases (e.g., *In re Marriage of Reilly* (1987) 196 Cal.App.3d 1119, 1123-1124), California law is no less clear that the court must exercise its discretion with

10

the goal of maintaining overall equality in the community estate.[8] (See Fam. Code, § 2550 ["Except upon the written agreement of the parties, or on oral stipulation of the parties in open court, or as otherwise provided in this division, in a proceeding for dissolution of marriage . . . , the court shall, either in its judgment of dissolution of the marriage, in its judgment of legal separation of the parties, or at a later time if it expressly reserves jurisdiction to make such a property division, divide the community estate of the parties equally"].) Accordingly, we conclude remand in this case is required to ensure the trial court has exercised its discretion with respect to Cecily's *Epstein* claims in a manner consistent with these important principles.

### C. Cecily's Challenge to the Denial of her $83,785 Reimbursement Request.

In a related argument, Cecily contends the trial court abused its discretion in denying her reimbursement request for $83,785, representing Cecily's separate funds she received from the 2002 refinance of the Castle Court property (her separate property), which she then used to pay community debt before the parties' separation. As mentioned above, the trial court denied all Cecily's reimbursement requests, including her *Epstein* requests, for the same basic reason: there was no community estate remaining from which she could be reimbursed. In challenging this ruling as an abuse of discretion, Cecily reasons, as she did above, that the trial court should have considered alternative sources of community assets from which she could be reimbursed, such as any future recovery of lost wages the community may receive from her workers compensation claim, a matter still under the court's jurisdiction. For many of the same reasons set forth above, we agree. (Pp. 10-11, *ante*.) Even in the absence of the policy justifications requiring reimbursement for a spouse's *post-separation* payment of community debt (*Epstein, supra*), it remains true that trial courts must exercise their discretion in ordering reimbursement with the goal of achieving equity between the divorcing parties. (Fam.

---

[8]    Of course, there are exceptions to this rule in situations where, for instance, the economic necessity of one spouse is a factor. (See Fam. Code, § 2601 ["Where economic circumstances warrant, the court may award an asset of the community estate to one party on such conditions as the court deems proper to effect a substantially equal division of the community estate"].)

11

Code, § 2550.) As such, we again conclude remand is required to ensure that the trial court in this case exercised its discretion in an appropriate manner.

## III. Richard's Challenges to the Trial Court's Disposition of Certain Property.

Richard makes several arguments in challenging the trial court's rulings with respect to the characterization of two properties acquired during the parties' marriage – to wit, a residential property at 150 Castle Court in Lafayette and an apartment building at 205 Daisy Avenue in Lodi. We address each in turn.

First, Richard argues as a general matter that the trial court simply failed to apply the PMA when deciding the characterization of the identified properties. We easily dispose of this argument. Indeed, any suggestion the trial court neglected the PMA when deciding the issues raised in this case are belied by the record itself. First, the trial court ruled, after a bifurcated trial, that the PMA was valid and enforceable. Further, the record from the continued trial, which covered, among other issues, the characterization of the parties' real properties, reflects numerous references by the court to the PMA. For example, after reiterating its previous finding that the PMA was "valid and enforceable," the court's tentative statement of decision includes a detailed analysis for the provision of the PMA, paragraph 4.a, governing responsibility for debts incurred by the parties during marriage. On this record, we decline to assume the court erred by failing to consider or apply the parties' PMA when dissolving their marriage. California law is clear that we, as reviewing court, must presume the correctness of, and resolve all ambiguities in favor of, the judgment or order that is subject to appeal. (*Denham v. Superior Court of Los Angeles County* (1970) 2 Cal.3d 557, 564; *Mark Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 610.) And, here, Richard provides us with nothing to rebut this presumption of correctness.[9]

_____

[9] Further, as Cecily points out, to the extent the trial court failed to provide any detailed analysis of the PMA in its statement of decision when characterizing these properties as Cecily's separate property, Richard had the burden, which he failed, to point out to the trial court in the first instance any purported deficiencies in its reasoning. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1134, 1138 [failure to alert trial court

12

Richard also raises more specific challenges to the trial court's rulings with respect to the properties on Daisy Avenue in Lodi and Castle Court in Lafayette. We discuss these challenges in turn below.

### A. The Lodi Property.

Richard first challenges the trial court's finding that the apartment complex on Daisy Avenue in Lodi, purchased in 1994, was Cecily's separate property (hereinafter, the Lodi property). This property was acquired as part of a so-called "1031 exchange," which is a tax-advantageous way for an owner to exchange one parcel of property for another.[10] Relevant to this exchange, at the time of Cecily's marriage to Richard, she had a 26 percent interest in property on San Miguel Road in Walnut Creek, which, undisputedly, was her separate property. In 1994, after marriage, Cecily sold the property. Cecily applied the net proceeds of this sale, which amounted to $244,000, toward the $850,000 purchase price of the Lodi property. The remainder of the purchase price was financed with a note secured by a deed of trust in the amount of $625,000. Title to both the San Miguel property and its replacement, the Lodi Property, was in Cecily's name as trustee of the Cecily D. Axtell Trust, a revocable trust established in 1989. Cecily was the sole trustee of this trust, which predated her marriage.[11]

The trial court found the Lodi Property to be Cecily's separate property, given that she acquired it by exchanging her interest in separate property she brought into the marriage. In disagreeing with this ruling, Richard relies on the fact that Cecily listed community income, among other income sources, in her loan application for the Lodi property, which, he concludes, renders it community property under the PMA. (See *In re Marriage of Grinius* (1985) 166 Cal.App.3d 1179, 1187 ["Loan proceeds acquired during

---

to claimed deficiencies in the statement of decision in the first instance may result in forfeiture of issues on appeal].)

[10] These tax advantages are unavailable where the taxpayer, here Cecily, deals with his or her spouse or other relative.

[11] Cecily was the sole settlor and trustee of the Cecily D. Axtell Trust, a revocable trust in her name. Richard was not a beneficiary of this trust.

marriage are presumptively community property; however, this presumption may be overcome by showing the lender intended to rely solely upon a spouse's separate property and did in fact do so"].) We disagree. This fact, considered in conjunction with the entire record, is insufficient by itself to undermine the trial court's finding that the Lodi property is Cecily's separate property.

"A trial court's findings regarding a property's separate or community character is binding and conclusive on review when supported by substantial evidence [citations], even though evidence conflicts or supports contrary inferences." (*In re Marriage of Grinius, supra,* 166 Cal.App.3d at p. 1185.) In conducting this review for substantial evidence, we keep in mind that "[p]roperty bought during marriage by either spouse is rebuttably presumed to be community property [citations], and typically the spouse asserting its separate character must overcome this presumption. . . . [However, premarital] agreements can control the character of marital property and do prevail when Family Law Act presumptions are to the contrary." (*In re Marriage of Grinius, supra,*166 Cal.App.3d at pp.1185-1186, citing *In re Marriage of Dawley* (1976) 17 Cal.3d 342, 357.)

Here, of course, Richard is correct that our inquiry begins with the PMA. In particular, paragraph 2.a is relevant, which provides: "All property, now owned by each of Richard and Cecily . . . and any other property, whether acquired before or during [the] marriage, title to which is taken in the name of Richard alone or Cecily alone, and all accumulations therefrom, is and shall remain the separate property of Richard or Cecily, as the case may be." Also relevant is paragraph 2.e, which provides with respect to the transfer of separate property: "Each party shall have the absolute right to buy, sell, use, transfer, make gifts of exchange, abandon, lease, consume, expend, assign, create a security interest in, mortgage, encumber, dispose of or otherwise manage and control his or her separate property free of any claim of the other that may arise as a result of their marriage." And, finally, with respect to responsibility for separate property debt, paragraph 4.a provides: "All debts and other liabilities incurred on behalf of the separate

14

property of each party shall be the sole responsibility of the party who owns the property."

Applying these provisions of the PMA to the relevant facts, set forth above, we conclude the trial court properly found the Lodi property to be Cecily's separate property. In the language of the PMA, not only was title "taken in the name of . . . Cecily alone" (PMA, ¶ 2.a), but Cecily actually acquired the Lodi Property as part of a tax-free exchange of another parcel of her separate property, acquired before marriage, which, under the PMA, she had the "absolute right to . . . sell, use, [or] transfer" (PMA, ¶ 2.e).

Thus, while Richard correctly notes the fact that Cecily listed community income sources on her loan application for the Lodi property, there is no provision of the PMA that requires us to treat particular property as community property just because the loan application on the property refers to a community source of income. Instead, the PMA provides that all debts incurred on behalf of separate property are the sole responsibility of the party owning that separate property. (PMA, ¶ 4.a.) As such, regardless of whether Cecily listed community income on the loan application for the Lodi Property, she alone was responsible for paying down the loan. And, consistent with PMA, paragraph 4.a, the trial court credited Cecily's testimony that the lender relied only on her separate property to approve the loan, and that all loan payments on the property, totaling $60,000 annually, came from the property's rental income rather than from any community source.[12]

As stated above, the standard for reviewing a trial court's finding that certain property acquired during marriage is a spouse's separate property is substantial evidence, not undisputed evidence. (*In re Marriage of Cochran* (2001) 87 Cal.App.4th 1050, 1057-1058; see also *In re Marriage of Mix* (1975) 14 Cal.3d 604, 611-612.) Here, the record described above, considered as a whole and in light of the parties' valid and enforceable PMA, provides substantial evidence to support the trial court's ruling. (See *In re*

---

[12]    Richard does not challenge the trial court's finding that, in any event, community income during this time period would have been inadequate to satisfy these loan payments.

15

*Marriage of Dawley, supra,* 17 Cal.3d at pp. 357-358 [a boat purchased by husband during marriage using separate funds for the down payment and monthly payments, as well as a loan in both spouses' names, was his separate property where, "[a]lthough the [premarital] agreement does not expressly refer to property purchased on credit, it provides that property acquired by James 'by purchase . . . during the marriage' shall be his separate property"].) Accordingly, the trial court's characterization of the Lodi Property as Cecily's separate property must stand.

### B. The Castle Court Property.

Richard next contends the trial court erred in finding the Castle Court property, where the parties maintained their primary residence during marriage, was Cecily's separate property. The following facts are relevant.

The Castle Court property was purchased by the couple in 1995, when the property's sellers transferred their interest to Cecily and Richard, jointly, by means of a grant deed signed February 13, 1995. In addition, the parties financed this purchase with a mortgage, also taken in both Cecily's and Richard's names, in the amount of $384,000. However, nearly simultaneously, Cecily and Richard, acting as husband and wife, executed another grant deed, dated February 16, 1995, which conveyed the property to Cecily alone, as trustee of the Cecily D. Axtell Trust established September 28, 1989. Years later, in 2002, Cecily refinanced the Castle Court property, signing as a married woman and as her sole and separate property. At the same time, Richard executed an interspousal grant deed conveying any and all interest in the property to Cecily in her name only.

At trial, Cecily testified in detail regarding the multiple deeds executed by the parties on the Castle Court property. Specifically, she explained that, originally, the parties intended to jointly purchase this property, with both contributing funds toward the down payment and monthly mortgage payments. However, after the parties' joint loan application had been approved but before the close of escrow, it became apparent Richard

16

would be unable to contribute to the down payment.[13]  Accordingly, the parties changed their original plan to instead have Cecily buy the property by herself.  To confirm this change of plans, Cecily wrote a letter to the title company stating that she intended to purchase the property herself in the name of her trust.  However, the title company informed Cecily the lender would not accept just her name on the title given that the loan itself was in the name of both Cecily and Richard.  Accordingly, to avoid losing her deposit on the property, the parties decided to execute a grant deed in the name of both Cecily and Richard, with the mutual understanding that Richard would then immediately execute another deed conveying the property to Cecily's trust (which he did).  They also decided that Richard would have the option to buy back into the property in the future, should he so desire (which he never did).  According to Cecily, she then made all mortgage payments on the Castle Court property from her separate property sources, including from the income rental she earned from the Lodi property.  Richard, in turn, made numerous repairs and improvements to the property.

The trial court credited this testimony from Cecily regarding her purchase of the Castle Court property.  Specifically, the court found that, even assuming Cecily had not successfully rebutted the presumption under Evidence Code section 662 that the owner of legal title to property is the owner of full beneficial title, *either* the February 16, 1995 grant deed signed by Richard, transferring the property from Cecily and Richard, husband and wife, to Cecily as trustee of the Axtell Trust, *or* the 2002 interspousal deed, also signed by Richard, granting any and all interest he may have had in the property to Cecily as "her sole and separate property," constituted a valid transmutation of any community property interest in the Castle Court property within the meaning of Family Code section 852.

In disputing the trial court's finding with respect to the Castle Court property, Richard again argues that Cecily had no right to the property because the PMA afforded her no right to use community assets (here, the mortgage taken in both their names) to

---

[13]      Cecily contributed to the down payment on the Castle Court property with funds from her own savings, as well as money she borrowed from her mother and step-father.

17

acquire separate property. Specifically, pointing to paragraph 2.a of the PMA, Richard insists that the clause, "any other property, whether acquired before or during . . . marriage, title to which is taken in the name of Richard alone or Cecily alone," refers only to "property acquired with the separate property of the acquiring spouse." Here, Richard insists, the parties never amended the PMA to identify the Castle Court property as Cecily's separate property. As such, Richard continues, "[a]ll actions of the parties from the time this property was acquired as community property failed to change the [property's] characterization [into separate property.]"[14] We disagree for several reasons (some of which we have already set forth).

First, as explained above (p. 15), nothing in the PMA states that a spouse acquiring separate property during marriage must rely solely on separate credit and not community credit in making the purchase. Rather, the PMA is silent on this issue. Paragraph 2.a, on which Richard relies to argue otherwise, states only that, with respect to property acquired during marriage (and "all accumulations therefrom"), title to which is in the name of Richard or Cecily alone, such property "is and shall remain the separate property of Richard or Cecily, as the case may be." That is exactly what happened here. As a result of Richard's signing of the February 16, 1995 grant deed and the June 13, 2002 interspousal transfer deed, title to the Castle Court property was in the name of Cecily alone, as trustee of her revocable trust. As such, under PMA, paragraph 2.a, the Castle Court property was Cecily's separate property *regardless* of whether community credit was relied upon to acquire it. (Accord *In re Marriage of Dawley, supra,* 17 Cal.3d at pp. 347-348, 358.) The absence of any amendment to the PMA with respect to ownership of the Castle Court property does not require a different result. Paragraph 2.a, as written, was adequate to cover this rather straightforward situation whereby one

---

[14]     Here, undisputedly, the PMA was never modified by the parties subsequent to its signing.

spouse conveys his or her community interest in real property to the other spouse, leaving but one name on the title.[15]

And, finally, while Richard suggests that he was somehow defrauded or "duped" out of his ownership of the Castle Court property, even assuming there were facts in this record to support him, the record accepted by the trial court is wholly consistent with the contrary. The trial court directly rejected the notion that Cecily had exerted undue influence on Richard with respect to the Castle Court property, relying on substantial evidence of Richard's free and voluntary participation in the purchase, including, but not limited to, Cecily's testimony regarding the parties' mutual understanding upon signing the 1995 grant deed that, based upon his failure to secure necessary funds for the down payment, the property would be bought by Cecily alone, to be held as her sole and separate property. At the same time, the trial court found not credible Richard's testimony that he only signed the subsequent 2002 interspousal transfer deed conveying any interest he had in the property to Cecily because "he believed [the deed] had no legal import."[16] The trial court was entitled to draw these conclusions on this record and, thus, we decline to disturb them. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874 ["when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court]; *In re Marriage of Mix, supra,* 14 Cal.3d at p. 614 [testimony from a single witness may constitute substantial evidence].)

---

[15] Further, as the trial court noted, even if the PMA failed to cover this situation, California law speaks directly to it. Under Family Code section 852, in ordinary circumstances, a married couple may transmute real or personal property from community property to one spouse's separate property so long as the transmutation is "made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected." (Fam. Code, § 852, subd. (a).) Here, the deeds executed by Richard satisfy these statutory requirements for transmuting community property to separate property.

[16] In so doing, the trial court noted that Richard, a licensed realtor, loan agent and real estate appraiser, "should certainly have been aware of the implication of the grant deed an [sic] inter-spousal transfer deeds which he signed."

## C. Proceeds of Cecily's Civil Lawsuit Settlement.

Richard's final contention is that the trial court erred in awarding Cecily $197,909.82, the amount in net proceeds she received upon settling a personal injury lawsuit filed against her former employer. The relevant facts are not in dispute.

Cecily received a $300,000 settlement on April 28, 2003 in a personal injury lawsuit she had filed against her former employer. Upon receipt of this settlement, Cecily reimbursed the community $63,000 to cover medical expenses that had been paid out on her behalf to address her injury. Cecily's net payment, in the end, was $197,909.82. Still pending at the time of judgment was Cecily's claim with the Workers' Compensation Board for lost wages. Cecily concedes a community interest in these wages.[17]

The trial court characterized the $197,909.82 in net proceeds Cecily received in this settlement as her separate property. Richard contends the court was wrong to do so, reasoning that the proceeds must be community property because they "don't fit any of the definitions of separate property [in the PMA]." (See *In re Marriage of Facter* (2013) 212 Cal.App.4th 967, 989 ["If the property acquired during marriage is not community property, it must be the separate property of the acquiring spouse"].)

Richard is mistaken. Indeed, the PMA says nothing about the characterization of a party's lawsuit settlement. Moreover, as Cecily points put, Family Code section 2603, subdivision (b), applies directly to the precise type of settlement proceeds she received in this case. Specifically, this provision states in relevant part: "Community estate personal injury damages shall be assigned to the party who suffered the injuries unless the court, after taking into account the economic condition and needs of each party, the time that has elapsed since the recovery of the damages or the accrual of the cause of action, and all other facts of the case, determines that the interests of justice require another disposition." (Fam. Code § 2603, subd. (b). See also *In re Marriage of Perry* (1997) 58

---

[17] As the trial court noted, Cecily's recovery of lost wages is also subject to a lien by Cecily's insurance company, which made disability payments to cover her lost wages under a policy she acquired prior to marriage.

20

Cal.App.4th 1104, 1112 ["California law has directed family law judges to award all money received in satisfaction of a personal injury judgment to the spouse who suffered the injury *unless* 'taking into account the economic condition and needs of each party' the 'interests of justice' require another disposition. (See current Fam. Code § 2603"].) The court in this case thus acted in accordance with California law in deciding that Cecily, who suffered through eight surgeries (five during marriage), was entitled to the entire net sum she received in settlement of her personal injury claim. Indeed, Richard nowhere contends the interests of justice in this case require something *other* than this disposition. And while he does suggest Cecily's lawsuit involved a claim of discrimination rather than personal injury, he offers no actual evidence to support it. Accordingly, we decline to disturb the trial court's award of these proceeds to Cecily.

Finally, we note the trial court has reserved jurisdiction over Cecily's separate claim for lost wages. Should Richard find cause to challenge the trial court's eventual disposition as to these wages, he may of course do so.

## IV. Cecily's Challenge to the $60,000 Attorney Fee Award to Richard.

Cecily's final challenge is to the trial court's award to Richard of $60,000 in attorney fees and costs. Cecily contends this award was an abuse of discretion because the trial court failed to consider certain necessary factors relevant to the *amount* of the award, such as the reasonableness of the positions taken by Richard's attorney and the degree of his success at trial. In doing so, Cecily concedes the trial court had discretion to make some award of attorney fees to Richard, but nonetheless maintains the amount awarded in this case was neither "reasonabl[e]" nor "necessary" within the meaning of Family Code section 2030. The applicable statutory scheme is as follows.

"[T]rial courts . . . have a duty at the conclusion of the case to make a just and reasonable award of attorney fees and costs, considering the circumstances of the parties." (*In re Marriage of Green* (1992) 6 Cal.App.4th 584, 593.) To that end, "section 2030 permits the trial court to order payment of attorney fees and costs as between the parties based upon their 'ability to pay' and their 'respective incomes and needs' in order to 'ensure that each party has access to legal representation to preserve all of the party's

21

rights.' (Fam. Code, § 2030, subd. (a).) 'The purpose of such an award is to provide one of the parties, if necessary, with an amount adequate to properly litigate the controversy.' [Citation.] The trial court may award attorney fees under section 2030 'where the making of the award, and the amount of the award, are just and reasonable under relative circumstances of the respective parties.' (Fam. Code, § 2032, subd. (a).)" (*In re Marriage of Rosen* (2002) 105 Cal.App.4th 808, 829.)

A motion for attorney fees and costs in marital dissolution proceedings " 'is addressed to the sound discretion of the trial court, and in the absence of a clear showing of abuse, its determination will not be disturbed on appeal. [Citations.]  The discretion invoked is that of the trial court, not the reviewing court, and the trial court's order will be overturned only if, considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order made. [Citations.]' [Citation]" (*In re Marriage of Keech* (1999) 75 Cal.App.4th 860, 866.)

At the same time, "while the court has considerable latitude in fashioning or denying a . . . fee award its decision must reflect an exercise of discretion and a consideration of the appropriate factors.  [Citations.]" (*In re Marriage of Hatch* (1985) 169 Cal.App.3d 1213, 1219.)  These appropriate factors include both the requesting spouse's need for the award and the paying spouse's ability to pay it.  (*In re Marriage of Davis* (1983) 141 Cal.App.3d 71, 78.  See also Fam. Code, § 2030, subd. (a)(1) ["the court shall ensure that each party has access to legal representation . . . to preserve each party's rights by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party . . . *whatever amount is reasonably necessary* for attorney's fees"] [italics added].)  The "major factors to be considered by a court in fixing a reasonable attorney's fee [include] 'the nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, his learning, his age, and his experience in the particular type of work demanded [citation]; the intricacies and importance of the litigation, the labor and the necessity for skilled legal training and ability in trying the

22

cause, and the time consumed. [Citations.]' [Citations.]"  (*In re Marriage of Cueva* (1978) 86 Cal.App.3d 290, 296.)

Here, the trial court found that awarding attorney fees and costs to Richard in the amount of $60,000 was both just and reasonable within the meaning of Family Code section 2030.  Cecily disputes this decision, providing several examples of how, she says, "RICHARD 'ran up' attorneys fees bills for both parties in his unsurprisingly futile attempts to recover more out of his marriage . . . than he was legally entitled to."  Most of Cecily's examples of Richard's alleged wrongdoing have already been discussed at length elsewhere in this opinion, and thus require little additional attention here.  Cecily points to Richard's failure to assert a community claim to the Lodi property until just days before trial, after appearing to accept its characterization as Cecily's separate property in pretrial filings; his repeated (and ongoing) assertions of a community interest in the Castle Court property, first, during the 2005-2006 trial and, second, after the trial court ruled against him, in moving to vacate the 2006 judgment; and his assertion of a community interest in the net proceeds of her personal injury settlement.  Cecily also points to Richard's significant reimbursement claims, nearly all of which the trial court denied after finding she had successfully traced the disputed funds to her separate property.

Having considered Cecily's arguments, we conclude she provides no basis for reversing the trial court's award.  As stated above, a fee award is subject to reversal "only if, *considering all the evidence viewed most favorably in support of its order, no judge could reasonably make the order made*. [Citations.]' [Citation]"  (*In re Marriage of Keech, supra,* 75 Cal.App.4th at p. 866 [italics added].)  That is simply not the case here.  First, the written decision reflects that the trial court considered the appropriate factors in awarding Richard attorney fees and costs in an amount both reasonable and necessary.  For example, the court found there was a "significant disparity" between Cecily's and Richard's ability to pay for legal representation, and that, while their attorneys' respective legal positions may have been aggressive, they were not frivolous given the complexity and breadth of the issues presented.  According to the court:

"While both parties have represented to the court that the fees are as high as they are based upon the unreasonable positions taken by the other party and the other parties [sic] failure to fully cooperate with resolving this matter outside of court, the court finds that the issues presented by the parties were extensive and complex, that the attorneys retained by both parties were experienced family law practitioners, and that the respective positions taken by both parties in this case were not so much frivolous as they were reflective of the aggressive positions taken by both parties and their litigation of this matter."

These conclusions, we add, were reached by the judicial officer, Commissioner Jeffrey D. Huffaker, who has presided over each of the trials in these by-all-means lengthy dissolution proceedings. Indeed, it was Commissioner Huffaker who has considered all the motions by the attorneys, heard all the evidence, including the live testimony of both parties, and, most importantly, issued all the relevant orders, including the April 2005 Judgment on Bifurcated Issues [PMA], the March 27, 2006 Judgment on Reserved Issues, and the July 29, 2011 Tentative Statement of Decision, in which the decision to award Richard $60,000 in fees was explained. And while Cecily insists that Richard's and his attorney's litigation tactics were not only unreasonable, but sanctionable under Family Code section 271 or Code of Civil Procedure section 128.5, Commissioner Huffaker clearly disagreed. On this record, and so far removed from the live testimony and other evidence, we decline to second-guess his superior judgment, particularly in the absence of any claim or suggestion that Commissioner Huffaker was anything other than a competent, thoughtful and unbiased jurist.

Finally, Cecily makes much of the fact that the trial court failed to state in its decision precisely how it reached the amount of the fee award. However, the decision reflects that the trial court did in fact consider relevant factors in reaching the $60,000 figure. For example, the court noted that Richard currently was earning $4,380 in wages and $862 in retirement benefits each month, and that his assets included approximately $11,789 in cash and personal property. Richard had already paid $101,800 in legal fees

24

and owed an additional $90,252.[18]  Richard's monthly obligations, in turn, totaled $4,621 per month, of which $2,000 consisted of attorney fees.  Then, after noting the array of issues tried during these proceedings, the trial court awarded the sum of $60,000, payable by Cecily at a rate of $1,500 per month.  Given the detailed nature of the court's analysis, we decline to accept Cecily's contention that the amount of this award is arbitrary.  " '[T]he rule is that *when the trial court is informed of the extent and nature of the services rendered*, it may rely on its own experience and knowledge in determining their reasonable value.' [Citation., italics added.]  . . . ' "The exercise of sound discretion by the trial court in the matter of attorney's fees includes also judicial evaluation of whether counsel's skill and effort were wisely devoted to the expeditious disposition of the case." [Citation.]' [Citation.]" (*In re Marriage of Keech, supra,* 75 Cal.App.4th at p. 870.  See also *In re Marriage of Cueva, supra,* 86 Cal.App.3d at p. 301 ["In many cases the trial court will be aware of the nature and extent of the attorney's services from its observation of the trial proceedings and the pretrial and discovery proceedings reflected in the file"].) As we have already explained, here, Commissioner Huffaker, was undoubtedly well aware of the nature and extent of legal services provided the parties.  Accordingly, we decline to second-guess his judgment as to the appropriate fee amount.  The mere fact that Richard was unsuccessful in arguing many issues does not require a contrary conclusion.  (E.g., *In re Marriage of Hublou* (1991) 231 Cal.App.3d 956, 966 ["there is no requirement that attorney fees be awarded only to prevailing parties, as they may be awarded *against* a prevailing party in family law proceedings"].)

Accordingly, we conclude the trial court's award of $60,000 in attorney fees and costs pursuant to Family Code section 2030 was wholly reasonable, and provides no basis for reversal on appeal.

---

[18]     According to Cecily, the court's award of $60,000 in fees and costs represented 42.4 percent of the amount of fees and costs Richard requested.

## DISPOSITION

The June 11, 2012 judgment on reserved issues is reversed in part. Specifically, we remand this matter to the trial court for the limited purpose of reconsidering, in light of the opinions expressed herein, Cecily's requests for *Epstein* credits and $83,785 in reimbursement for separate resources she used to pay community obligations. In all other regards, this judgment is affirmed. The parties are to bear their own respective costs on appeal.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Pollak, J.

26